UNITED STATES of America, Appellee,

v.

Charles Eldon GOULD, Appellant.

UNITED STATES of America, Appellee,

v.

Joseph Patrick CAREY, Appellant.

Nos. 75–1808, 75–1826.

United States Court of Appeals,
Eighth Circuit.

Submitted March 10, 1976.

Decided May 6, 1976.

Raymond J. Gazzo, Des Moines, Iowa, for appellants; William L. Kutmus, Des Moines, Iowa, on brief, for appellant, Joseph Patrick Carey.

Allen L. Donielson, U. S. Atty., Paul A. Zoss and George H. Perry, Asst. U. S. Attys., Des Moines, Iowa, for appellee.

Before GIBSON, Chief Judge, and HEANEY and WEBSTER, Circuit Judges.

GIBSON, Chief Judge.

Defendants, Charles Gould and Joseph Carey, were convicted of conspiring to import (Count I) and actually importing (Count II) cocaine from Colombia, South America, into the United States in violation of the Controlled Substances Import and Export Act. 21 U.S.C. § 951 *et seq.* (1970). Both defendants received five-year sentences on each count to run concurrently, as well as a special parole term of three years.

The evidence persuasively showed that defendants and David Miller enlisted the cooperation of Miller's sister, Barbara Kenworthy,[1] who agreed to travel to Colombia with defendants and smuggle the cocaine into the United States by placing it inside two pairs of hollowed-out platform shoes. In May of 1975, defendants and Ms. Kenworthy travelled to Colombia where the cocaine was purchased and packed in Ms. Kenworthy's shoes. The success of the importation scheme was foiled when, upon Ms. Kenworthy's arrival to the Miami airport from Colombia, a customs agent insisted upon x-raying the cocaine-laden shoes. Approximately two pounds of cocaine were discovered and seized by customs officials. Ms. Kenworthy was thereafter interrogated by two agents of the Drug Enforcement Administration (DEA) and she informed them that she had been directed to deliver the cocaine to Miller in Des Moines, Iowa. She finally agreed to cooperate with the

1. Miller was also charged as a co-defendant. He pled guilty prior to trial and testified for the Government. Barbara Kenworthy was listed as a co-conspirator but was not charged.

agents and make a controlled delivery of a cocaine substitute to Miller. DEA agents in Des Moines then secured a search warrant, the delivery was consummated and Miller was arrested.

Defendants do not challenge the sufficiency of the evidence but contend that the District Court[2] erred in (1) improperly taking judicial notice and instructing the jury that cocaine hydrochloride is a schedule II controlled substance, and (2) not striking the direct testimony of their co-conspirator, Miller, when his invocation of his Fifth Amendment privilege against self-incrimination unduly restricted the scope of defendants' cross-examination.

As to the first issue, defendants contend that evidence should have been presented on the subject of what controlled substances fit within schedule II for the purpose of establishing a foundation that cocaine hydrochloride was actually within that schedule. Schedule II controlled substances, for the purpose of the Controlled Substances Import and Export Act, conclude the following:

> (a) Unless specifically excepted or unless listed in another schedule, any of the following substances whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis:

> \* \* \* \* \* \*

> (4) Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, except that the substances shall not include decocainized coca leaves or extraction of coca leaves, which extractions do not contain cocaine or ecgonine.

21 U.S.C. § 812 (1970); *see* 21 C.F.R. § 1308.12 (1975).

█ At trial, two expert witnesses for the Government testified as to the composition of the powdered substance removed from Ms. Kenworthy's platform shoes at the Miami airport. One expert testified that the substance was comprised of approximately 60 percent cocaine hydrochloride. The other witness stated that the white powder consisted of 53 percent cocaine.[3] There was no direct evidence to indicate that cocaine hydrochloride is a derivative of coca leaves. In its instructions to the jury, the District Court stated:

> If you find the substance was cocaine hydrochloride, you are instructed that cocaine hydrochloride is a schedule II controlled substance under the laws of the United States.

Our inquiry on this first assignment of error is twofold. We must first determine whether it was error for the District Court to take judicial notice of the fact that cocaine hydrochloride is a schedule II controlled substance. Secondly, if we conclude that it was permissible to judicially notice this fact, we must then determine whether the District Court erred in instructing the jury that it must accept this fact as conclusive.

█ The first aspect of this inquiry merits little discussion. In *Hughes v. United States*, 253 F. 543, 545 (8th Cir. 1918), *cert. denied*, 249 U.S. 610, 39 S.Ct. 291, 63 L.Ed. 801 (1919), this court stated:

> It is also urged that there was no evidence that morphine, heroin, and cocaine are derivatives of opium and coca leaves. We think that is a matter of which notice may be taken. In a sense the question is one of the definition or meaning of words long in common use, about which there is no obscurity, controversy, or dispute, and of which the imperfectly informed can

---

**2.** The Honorable William C. Hanson, Chief Judge, United States District Court for the Southern District of Iowa.

**3.** It is not significant that one expert witness testified that the substance contained cocaine

hydrochloride and the other testified that it was comprised in part of cocaine. The fact that cocaine hydrochloride contains cocaine is common knowledge. *United States v. Sims*, 529 F.2d 10, 11 (8th Cir. 1976).

gain complete knowledge by resort to dictionaries within reach of everybody. * * * Common knowledge, or the common means of knowledge, of the settled, undisputed, things of life, need not always be laid aside on entering a courtroom.

It is apparent that courts may take judicial notice of any fact which is "capable of such instant and unquestionable demonstration, if desired, that no party would think of imposing a falsity on the tribunal in the face of an intelligent adversary." IX J. Wigmore, *Evidence* § 2571, at 548 (1940). The fact that cocaine hydrochloride is derived from coca leaves is, if not common knowledge, at least a matter which is capable of certain, easily accessible and indisputably accurate verification. *See Webster's Third New International Dictionary* 434 (1961). Therefore, it was proper for the District Court to judicially notice this fact. Our conclusion on this matter is amply supported by the weight of judicial authority. *United States v. Mills,* 149 U.S.App.D.C. 345, 463 F.2d 291, 296 n. 27 (D.C.Cir. 1972); *Padilla v. United States,* 278 F.2d 188, 190 (5th Cir. 1960); *United States v. Amidzich,* 396 F.Supp. 1140, 1148 (E.D.Wis.1975); *see United States v. Sims,* 529 F.2d 10, 11 (8th Cir. 1976); *United States v. Pisano,* 193 F.2d 355, 359 (7th Cir. 1971).

■ Our second inquiry involves the propriety of the District Court's instruction to the jurors that this judicially noticed fact must be accepted as conclusive by them. Defendants, relying upon Fed.R.Ev. 201(g), urge that the jury should have been instructed that it could discretionarily accept or reject this fact. Rule 201(g) provides:

In a civil action or proceeding, the court shall instruct the jury to accept as conclusive any fact judicially noticed. In a criminal case, the court shall instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed.[4]

It is clear that the reach of rule 201 extends only to adjudicative, not legislative, facts. Fed.R.Ev. 201(a). Consequently, the viability of defendants' argument is dependent upon our characterization of the fact judicially noticed by the District Court as adjudicative, thus invoking the provisions of rule 201(g). In undertaking this analysis, we note at the outset that rule 201 is not all-encompassing. "Rule 201 * * * was deliberately drafted to cover only a small fraction of material usually subsumed under the concept of 'judicial notice.'" 1 J. Weinstein, *Evidence* ¶ 201[01] (1975).

■ The precise line of demarcation between adjudicative facts and legislative facts is not always easily identified. Adjudicative facts have been described as follows:

When a court * * * finds facts concerning the immediate parties—who did what, where, when, how, and with what motive or intent—the court * * * is performing an adjudicative function, and the facts are conveniently called adjudicative facts. * * *

Stated in other terms, the adjudicative facts are those to which the law is applied in the process of adjudication. They are the facts that normally go to the jury in a jury case. They relate to the parties, their activities, their properties, their businesses.

2 K. Davis, *Administrative Law Treatise* § 15.03, at 353 (1958).

4. In the proposed federal Rules of Evidence, forwarded by the Supreme Court of the United States to Congress on February 5, 1973, rule 201(g) did not draw this distinction between civil and criminal cases. The proposed rule 201(g) provided that "[t]he judge shall instruct the jury to accept as established any facts judicially noticed." Congress disagreed with this unqualified rule requiring mandatory instructions in all cases. It was feared that requiring the jury to accept a judicially noticed adjudicative fact in a criminal case might infringe upon the defendants' Sixth Amendment right to a trial by jury. H.Rep. No. 93–650, 93d Cong., 1st Sess. 6–7 (1973), *reprinted in 4 U.S. Code Cong. & Admin.News* pp. 7075, 7080 (1974). Consequently, Congress adopted the present text of rule 201(g) which requires a mandatory instruction in civil cases but a discretionary instruction in criminal cases.

Legislative facts, on the other hand, do not relate specifically to the activities or characteristics of the litigants. A court generally relies upon legislative facts when it purports to develop a particular law or policy and thus considers material wholly unrelated to the activities of the parties.

> Legislative facts are ordinarily general and do not concern the immediate parties. In the great mass of cases decided by courts * * *, the legislative element is either absent or unimportant or interstitial, because in most cases the applicable law and policy have been previously established. But whenever a tribunal engages in the creation of law or of policy, it may need to resort to legislative facts, whether or not those facts have been developed on the record.

2 K. Davis, *Administrative Law Treatise, supra* at § 15.03.[5]

Legislative facts are established truths, facts or pronouncements that do not change from case to case but apply universally, while adjudicative facts are those developed in a particular case.

Applying these general definitions, we think it is clear that the District Court in the present case was judicially noticing a legislative fact rather than an adjudicative fact. Whether cocaine hydrochloride is or is not a derivative of the coca leaf is a question of scientific fact applicable to the administration of the Comprehensive Drug Abuse Prevention and Control Act of 1970. 21 U.S.C. § 801 *et seq.* (1970). The District Court reviewed the schedule II classifications contained in 21 U.S.C. § 812, construed the language in a manner which comports with common knowledge and understanding, and instructed the jury as to the proper law so interpreted. It is undisputed that the trial judge is required to fully and accurately instruct the jury as to the law to be applied in a case. *Bird v. United States,* 180 U.S. 356, 361, 21 S.Ct. 403, 405, 45 L.Ed. 570, 573 (1901). When a court attempts to ascertain the governing law in a case for the purpose of instructing the jury, it must necessarily rely upon facts which are unrelated to the activities of the immediate parties. These extraneous, yet necessary, facts fit within the definition of legislative facts and are an indispensable tool used by judges when discerning the applicable law through interpretation.[6] The District Court, therefore, was judicially noticing such a legislative fact when it recognized that cocaine hydrochloride is derived from coca leaves and is a schedule II controlled substance within the meaning of § 812.

Through similar reasoning, this judicially noticed fact simply cannot be appropriately categorized as an adjudicative fact. It does not relate to "who did what, where, when, how, and with what motive or intent," nor is it a fact which would traditionally go to the jury. See 2 K. Davis, *Administrative Law Treatise, supra* at § 15.03. The fact that cocaine hydrochloride is a derivative of coca leaves is a universal fact that is unrelated to the activities of the parties to this litigation. There was no preemption of the jury function to determine what substance was actually seized from Ms. Kenworthy at the Miami airport. The jury was instructed that, if it found that the confiscated sub-

---

**5.** For a further discussion on the distinction between legislative and adjudicative facts, see *Marshall v. Sawyer,* 365 F.2d 105, 111–12 (9th Cir. 1966), *cert. denied,* 385 U.S. 1006, 87 S.Ct. 713, 17 L.Ed.2d 545 (1967); *State v. Freeman,* 440 P.2d 744, 757–58 (Okla.1968); C. McCormick *Law of Evidence* §§ 328, 331 (2d ed. 1972); Fed.R.Ev. 201, Notes of Advisory Committee; Davis, Judicial Notice, 55 Colum.L.Rev. 945, 952–59 (1955).

**6.** The Notes of the Advisory Committee to rule 201 offer support for the proposition that courts utilize legislative facts when they interpret a statute.

> While judges use judicial notice of "propositions of generalized knowledge" in a variety of situations: *determining the validity and meaning of statutes,* formulating common law rules, deciding whether evidence should be admitted, assessing the sufficiency and effect of evidence, *all are essentially nonadjudicative in nature.* (Emphasis added.)

See *State v. Freeman,* 440 P.2d 744, 757 (Okl. 1968); C. McCormick, *Law of Evidence* § 328, at 759 (2d ed. 1972); 1 J. Weinstein, *Evidence* ¶ 201[01] (1975).

stance was cocaine hydrochloride, the applicable law classified the substance as a schedule II controlled substance.

It is clear to us that the District Court took judicial notice of a legislative, rather than an adjudicative, fact in the present case and rule 201(g) is inapplicable. The District Court was not obligated to inform the jury that it could disregard the judicially noticed fact. In fact, to do so would be preposterous, thus permitting juries to make conflicting findings on what constitutes controlled substances under federal law.[7]

■ Defendants' second issue involves the propriety of the District Court's refusal to strike the direct testimony of defendants' co-conspirator, Miller, in light of Miller's refusal to testify on any matter relating to his previous smuggling activities.

Ms. Kenworthy, an unindicted co-conspirator, testified as a Government witness at trial. She stated that in February of 1975, three months prior to the aborted smuggling attempt involved in the present case, she and Miller had perpetrated a similar plan to illegally import cocaine from South America. Ms. Kenworthy and Miller were successful in this February venture. Miller, when called as a Government witness, informed all parties that he would refuse to answer any questions relating to the February incident by invoking his Fifth Amendment privilege against compulsory self-incrimination. The District Court admonished counsel not to question Miller before the jury on this subject. Defense counsels' request to have Miller exercise his Fifth Amendment privilege before the jury was denied.

Miller had an undeniable right to exercise his Fifth Amendment privilege since evidence relating to Miller's February smuggling activities would have subjected him to potential criminal charges beyond those encompassed in his guilty plea. *United States v. Franz,* 469 F.2d 76 (9th Cir. 1972). Defendants contend, however, that Miller's refusal to testify on this matter severely limited their ability to impeach his direct testimony by showing bias, interest and a character defect, and that the court's restrictive ruling violated defendants' Sixth Amendment right to confront witnesses, which could only be remedied by striking all of Miller's direct testimony.

We are not confronted in this case with an attempt by the Government to admit inculpatory, substantive evidence through indirect means without affording the defendants an opportunity to cross-examine the source of this evidence. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Barber v. Page,* 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Nor are we presented with a situation where the Government, in the face of a refusal to testify by a crucial witness, was permitted to read to the jury a statement by the witness which implicated the defendants. *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). Miller testified candidly and in detail concerning his participation in the May smuggling incident which gave rise to the present prosecution. He was subjected to probing cross-examination by defendants' attorneys on this subject. Any critical testimony by Miller which implicated defendants in the May incident was fully explored and attacked on cross-examination before the jury.

■ The question remains as to whether the defendants were denied their right of confrontation by being precluded from questioning Miller about his previous smuggling activities in which defendants played no role. To the extent that defendants

---

7. Common sense dictates that the construction urged upon us by defendants is not well-taken. The fact that cocaine hydrochloride is derived from coca leaves is scientifically and pharmacologically unimpeachable. It would be incongruous to instruct the jurors on this irrefutable fact and then inform them that they may disregard it at their whim. It would be similarly illogical if we were to conclude that trial judges could rely upon generally accepted, undisputed facts in interpreting the applicable statutory law, yet obligate them to instruct the jury that it could disregard the factual underpinnings of the interpretation in its discretion.

were prevented from questioning Miller about those matters, there was at least a limited restriction on the defendants' right of cross-examination. The right of confrontation includes the right to cross-examine adverse witnesses. *Pointer v. Texas, supra,* 380 U.S. at 404, 85 S.Ct. at 1068, 13 L.Ed.2d at 926. However, when a conflict arises between a witness's proper exercise of his Fifth Amendment privilege against self-incrimination and the defendant's right to confront witnesses, a proper balance must be struck. In striking this balance, courts have considered the nature and significance of the witness's testimony to assess the probability of resultant prejudice to defendant because of the inability to fully cross-examine the witness. If the subject upon which the witness refuses to testify relates to matters elicited by the Government on direct examination and the defendant's counsel is prejudicially hampered in his ability to assail the truthfulness of the direct testimony, the court should partially or totally strike the witness's testimony. *United States v. Newman,* 490 F.2d 139, 145–46 (3d Cir. 1974); *United States v. Cardillo,* 316 F.2d 606, 611–13 (2d Cir.), *cert. denied,* 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963); *see United States v. Smith,* 342 F.2d 525, 527 (4th Cir.), *cert. denied,* 381 U.S. 913, 85 S.Ct. 1535, 14 L.Ed.2d 434 (1965). If the witness's refusal to testify merely precludes inquiry into an area relating to a collateral matter, such as the credibility of the witness, the defendant has suffered no prejudice and the witness's other testimony may be admitted. *United States v. Brierly,* 501 F.2d 1024, 1027 (8th Cir.), *cert. denied,* 419 U.S. 1052, 95 S.Ct. 631, 42 L.Ed.2d 648 (1974); *Fountain v. United States,* 384 F.2d 624, 628 (5th Cir. 1967), *cert. denied, sub nom. Marshall v. United States,* 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968); *United States v. Cardillo, supra.*

We have no difficulty in concluding that the testimony defendants sought to extract from Miller related only to his credibility and was of peripheral significance to the substantive aspects of the case. Since the record clearly shows that Miller's testimony was not offered in exchange for any promises of immunity or leniency in regard to possible subsequent prosecutions arising out of previous smuggling activities, defendants would not have been able to show any bias or interest on this point. As to any character flaws which could have been presented to the jury, any evidence on this matter would have been cumulative since the jury had already heard substantial evidence which was inculpatory as to Miller. Ms. Kenworthy had testified that Miller had been the instigator and major participant in the February smuggling scheme. Miller testified as to his own major involvement in the May smuggling attempt. In view of all of this testimony, the District Court was within its discretion and did not err in upholding Miller's refusal to testify and not striking the direct testimony.

The judgment of conviction is affirmed.