# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1572

_____

| | | |
|---|---|---|
| George T. Qualley, | * | |
| | * | |
| Appellee, | * | Appeal from the United States |
| | * | District Court for the Northern |
| v. | * | Northern District of Iowa |
| | * | |
| Clo-Tex International, Inc., and | * | |
| John T. Cross, Sr., | * | |
| | * | |
| Appellants. | * | |

_____

Submitted: December 15, 1999

Filed:  May 25, 2000

Before BEAM and HEANEY, Circuit Judges, and KYLE, District Judge.[1]

KYLE, District Judge.

George T. Qualley ("Qualley") brought suit in the United States District Court for the Northern District of Iowa alleging that Clo-Tex International, Inc. ("Clo-Tex") and John T. Cross, Sr., ("Cross") participated with as many as fifty

---

[1] The HONORABLE RICHARD H. KYLE, United States District Judge for the District of Minnesota, sitting by designation.

1

other persons in a scheme to defraud Qualley's corporation, American African Trading Co., through the fictitious sale of Nigerian crude oil. Qualley asserted claims against Clo-Tex and Cross under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d), and Iowa common law for conspiracy to defraud. The jury returned a verdict in Qualley's favor, finding that Clo-Tex conspired to defraud Qualley's company, that Cross both conspired to violate and did violate RICO, that Cross and Clo-Tex were each liable to Qualley for actual damages, and that Clo-Tex was liable to Qualley for one million dollars in punitive damages.

Cross and Clo-Tex appeal, arguing that the district court erred in making several evidentiary rulings, in declining to give a requested jury instruction, and in sustaining the actual and punitive damages awarded by the jury. Cross and Clo-Tex also appeal from the district court's denial of their motion for judgment as a matter of law. For the reasons discussed below, we reverse and remand.

## I.

George Qualley was a practicing attorney in Sioux City, Iowa from 1960 until his retirement in the mid 1990s. (Trial Tr. at 67.) Qualley specialized in tax law and commercial law. (Id.) By the 1970s and 1980s, Qualley had nine offices of his own in the United States, approximately 30 affiliated offices in the United States, and 15 or 16 affiliated offices in various parts of the world, including Nigeria. (Id.) The Nigerian law firm of Onyeukwu & Onyeukwu had been affiliated with Qualley's firm on certain international business transactions since the mid-1980s. (Id. at 68.)

2

The negotiations leading up to the fateful oil transaction by Qualley's company are long and involved. In summary, on or about November 14, 1994, Qualley received a letter from Maxwell Onyeukwu, a Nigerian barrister at the firm of Onyeukwu & Onyeukwu.[2] Onyeukwu, apparently a delegate to Nigeria's Constitutional Conference, sought Qualley's help in arranging a meeting with "some leading Congressmen to exchange ideas on matters of ideological interest" in order to help his political bid for the Governorship of the Imo State. (Appellants' App. at 111.) Qualley responded that he was unable to put Onyeukwu in touch with American politicians; Qualley proposed instead that he and Onyeukwu work to develop trade relations between the United States and Nigeria as to certain products, including oil, gold, and shrimp. (Id. at 115-16, 118.)

On January 21, 1995, Onyeukwu stated that he had spoken to representatives of the Nigerian National Petroleum Corporation ("NNPC"). Onyeukwu reported that the NNPC was willing to sell 200,000 barrels of crude oil upon receipt up front of one-fourth the total cost, the balance being due upon receipt of the oil. (Id. at 119.) Qualley responded that he would not pay in advance for anything from Nigeria due to the political situation there, but could promise payment in full on delivery. (Id. at 120.)

Onyeukwu asked Qualley for a name to be used for incorporation in Nigeria so that they could enter into a joint venture with the NNPC for the "exporation [sic],

---

[2] Qualley had known Onyeukwu for about ten years, working on some projects together including an agricultural development program in Nigeria. (Trial Tr. at 85.)

sales and marketing of Nigerian crude oil." (Id. at 122.) Onyeukwu offered to incorporate the business for Qualley in Nigeria, but advised Qualley that the fees and taxes would be $39,300. (Id. at 124-25.) By a facsimile letter dated January 27, 1995, Qualley reiterated that he was unwilling to pay out any money prior to receiving earnings from the sale of the oil, but stated that he, together with his wife and his thirteen-year old son, would be the directors of the Nigerian corporation. (Id. at 127.) Qualley also told Onyeukwu that he had an order in hand for 2,000,000 barrels of oil and again promised payment in full for the oil upon delivery. (Id.) Sometime between January 31 and February 16, 1995, Onyeukwu sent Qualley a fax stating that the African Trading Company, Inc., had been incorporated in Nigeria on Qualley's behalf and asking Qualley to prepare letterhead stationery identifying the officers of the corporation.[3] (Id. at 133.)

On or about February 16, 1995, Qualley signed a letter addressed to NNPC on African Trading Company letterhead applying for a three-year contract to "spot lift" between two and ten million barrels of crude oil "for Shell International in London."[4] (Id. at 136; Trial Tr. at 332.) On or about March 8, 1995, Qualley

---

[3] Qualley testified that he and Onyeukwu also organized an American counterpart corporation called the American African Trading Company, and that the two entities were "really one in the same. One is incorporated in Nigeria, and the other is in the United States." (Trial Tr. at 101.)

[4] At trial, Qualley offered into evidence a March 17, 1995 Irrevocable Corporate Purchase Order from the Marathon Holding Group Company ("Marathon") for two million barrels of crude oil, and an April 3, 1995 contract for the sale by the American African Trading Company of approximately two million barrels of Nigerian crude oil to Marathon. (Appellants App. at 151-158.)

4

traveled to Nigeria to meet with members of the NNPC and sign contracts for the purchase of 2,000,000 barrels of crude oil. (Trial Tr. at 125.) Qualley testified that he hired his friend, Leo Eriksen, an engineer, to travel with him and advise him. (Trial Tr. at 115.) On or about March 15, 1995, Qualley signed a contract to purchase the crude oil on behalf of American African Trading Company. (Appellants' App. at 141-50.) Eriksen signed as a witness. (Id. at 150.) Qualley testified that a "John West" signed the contract as a director of the NNPC. (Trial Tr. at 125-127.)

While Qualley was in Nigeria, Eriksen caused three wire transfers to be made to account number 17692470 at First National Bank of Maryland ("FNB Maryland").[5] Qualley testified that John West provided the wiring instructions for the three transfers. (Trial Tr. at 134.) At this time, Clo-Tex, a Maryland corporation with its principal place of business in Baltimore, had account number 17692470 with FNB Maryland. (Trial Tr. at 65). All three wire transfers were made to the attention of John Cross, who was, at all material times, a stockholder, president and managing executive of Clo-Tex. (Id.) Cross testified that all three payments were credited to the account of a "Société James Mercantile," a company located in Benin that purchases used clothing from Clo-Tex. (Id. at 503-05, 604-08.) The owner of Société James Mercantile is a Nigerian named James Kalu who also apparently was known by the name James Kelly. (Id. at 505.)

---

[5]On or about March 13, 1995, the sum of $5,000.00 was wired to the account by "American Rawhide, Donald Sukach." (Trial Tr. at 65) On or about March 17, 1995, Eriksen wired $5,000.00 to the account, and on or about March 24, 1995, Eriksen wired $14,000.00 to the account. (Id.)

On March 20, 1995, Qualley signed agreements relating to the shipment of the oil to the United States. (Appellants App. at 163-77.) The oil was to arrive in Houston. (Trial Tr. at 203.) Qualley returned to Iowa and, several days later, flew to Houston to meet John West and watch the oil arrive. (Trial Tr. at 203-06.) West never flew to Houston and the oil shipments never arrived. (Id.)

In August of 1995, the American African Trading Company assigned to Qualley whatever claims it had against Clo-Tex, Cross and the others. (Trial Tr. at 185-86.) Qualley filed his Complaint on August 29, 1995, naming 51 defendants including appellants Cross and Clo-Tex. Qualley obtained service of process only on Cross and Clo-Tex.[6]

After a four-day trial, the jury returned a verdict by special interrogatories in favor of Qualley. The jury found that both Cross and Clo-Tex were liable to Qualley for actual damages totaling $41,282.00.[7] The jury also awarded Qualley one million dollars in punitive damages against Clo-Tex. However, the jury determined that Clo-Tex's wrongful conduct was not directed primarily at Qualley; therefore, under Iowa law Qualley was entitled to receive only twenty-five percent of the punitive damage award, the remainder to be paid into Iowa's Civil Reparations Fund. (Amended J.) Following trial, Qualley moved for and was

---

[6] Qualley amended his complaint three times, adding a total of five more defendants. Of the 56 defendants, 40 allegedly resided in Nigeria and/or were Nigerian citizens.

[7] That sum consisted of $24,000 for money wired to Clo-Tex's account and $17,282.00 in expenses.

awarded treble damages against Cross pursuant to 18 U.S.C. § 1964. Cross and Clo-Tex filed a motion for judgment as a matter of law or, in the alternative, for a new trial. That motion was based on the same evidentiary issues asserted now on appeal and also challenged the punitive damages award as excessive. The trial court denied Appellants' motions.

## II.

On appeal, Cross and Clo-Tex raise seven issues: (1) whether the trial court improperly admitted deposition testimony of Rudolph Datcher that contained inadmissible hearsay; (2) whether the trial court improperly admitted deposition testimony of Nathaniel Spinner that contained inadmissible hearsay; (3) whether the trial court improperly took judicial notice of the perpetration of Nigerian fraud schemes on Americans; (4) whether the trial court erred in refusing to instruct the jury on an "in pari delicto" defense; (5) whether the punitive damage award against Clo-Tex is excessive; (6) whether the jury erred in including the $24,000.00 in wire transfers in its compensatory damages award; and (7) whether the trial court erred in denying their motion for judgment as a matter of law. We begin with the evidentiary issues.

A trial court's evidentiary rulings are reviewed under an abuse of discretion standard. See United HealthCare Corp. v. American Trade Ins. Co., Ltd., 88 F.3d 563, 573 (8th Cir. 1996); Maddox v. Patterson, 905 F.2d 1178, 1179 (8th Cir. 1990); Adams v. Fuqua Indus., 820 F.2d 271, 273 (8th Cir. 1987). With respect to a trial court's ruling that admits evidence, error may not be predicated on such a ruling unless a substantial right of the party is affected and a timely objection or

7

motion to strike appears of record stating the specific ground for objection. Fed. R. Evid. 103(a). Furthermore,

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Fed. R. Civ. P. 61. Thus, "[w]here the district court errs in admitting evidence, we will only grant a new trial or set aside a verdict if there is a clear and prejudicial abuse of discretion." Lovett ex rel. Lovett v. Union Pac. R.R. Co., 201 F.3d 1074, 1080 (8th Cir. 2000). An abuse of discretion occurs when the error prejudicially influences the outcome of the case, see id., and the burden of showing prejudice rests on the party asserting it. See Tyler v. White, 811 F.2d 1204, 1207 (8th Cir.1987).

A.    Judicial Notice of Nigerian Fraud Scams

Cross and Clo-Tex assert that the trial court erred in taking judicial notice of the following facts pursuant to Rule 201 of the Federal Rules of Evidence:

> One, that at all times pertinent to this lawsuit, there were Nigerian fraud scams perpetrated on people in the United States and other countries in the world;

> Two, the fraud scams involved, among other things, oil deals that never materialized.

8

(Trial Tr. at 483; see also id. at 444-45.)  In deciding whether to take judicial notice of these facts, the trial court examined a Congressional report dated December 12, 1995, a Senate committee report, at least two newspaper articles, a videotape from the television news magazine "20/20," a videotape from the television news magazine "60 Minutes," and a videotape from the British Broadcasting Corporation. (Addendum to Appellants' Br. at 12.)

Rule 201 governs only the judicial notice of "adjudicative facts."  Fed. R. Evid. 201(a).  The advisory committee notes to Rule 201 distinguish between "adjudicative facts" and "legislative facts."  See id., adv. ctte. notes (citing 2 Kenneth Davis, Administrative Law Treatise at 353 (1958)).  Adjudicative facts are "facts that normally go to the jury in a jury case.  They relate to the parties, their activities, their properties, their businesses."  Id.; see also U.S. v Gould, 536 F.2d 216, 219 (8th Cir. 1976) (stating that adjudicative facts concern "who did what, where, when, how and with what motive or intent.") (quoting 2 Kenneth Davis, Administrative Law Treatise § 15.03 at 353 (1958)).  By contrast, "[l]egislative facts do not relate specifically to the activities or characteristics of the litigants.  A court generally relies upon legislative facts when it purports to develop a particular law or policy and thus considers material wholly unrelated to the activities of the parties."  Gould, 536 F.2d at 220.

The facts of which the trial court took judicial notice did not specifically concern the parties before the court.  The trial court acknowledged that the evidence underlying the noticed facts "[had] to do with the pretty much universal publicity that was out about what Nigeria was doing, Nigerian people."  (Trial Tr. at 445.)

9

The videotapes contained nothing involving anyone with whom Qualley had communicated. (Trial Tr. at 12.) Nor were the other exhibits the trial court considered "specific to Mr. Cross or even to Maxwell [Onyeukwu] and others [involved in the scheme Qualley alleged]." (Id. at 445.) Indeed, two of the documents, Exhibits 109 and 110, were legislative reports. Thus, the trial court erred in using Federal Rule of Evidence 201 to take judicial notice of facts that were "legislative" rather than "adjudicative," and were therefore outside the scope of the rule. We address whether this error is harmless, in section C, *infra*.

B.      Admission of Deposition Testimony

Cross and Clo-Tex contend that several portions of the deposition testimony of Rudolph Datcher and Nathaniel Spinner were inadmissible, either as hearsay or as testimony lacking foundation. In 1994, Datcher and Spinner each lost money in connection with shipments of crude oil purportedly sent to the United States from Nigeria. Both Datcher and Spinner met in Maryland on one or more occasions with James Cooper, Allen Cassidy, Joyce Cassidy, and Prince Zankli about oil shipments.[8] Both Spinner and Datcher were told that the oil belonged to the Cassidys' company, American Business International ("ABI"); both were shown documents relating to the oil shipments. (Trial Tr. at 421, 482.) Spinner provided the Cassidys with two $25,000 checks made payable to ABI. (Trial Tr. at 378-79.) Datcher endorsed over to ABI a cashiers check payable to himself; in return he

---

[8]Spinner also met with a Dr. Tony Alike, a man named Victor, and a man named John.

received a promissory note signed by Prince Zankli on behalf of ABI and Metropolitan Mortgage Corporation.[9]

## 1. Datcher Testimony

After Datcher had turned over the cashiers check to ABI, he heard nothing further about the oil shipment and could not reach the Cassidys or Prince Zankli. He then called the First National Bank of Maryland and spoke with a bank employee. Datcher testified that this employee told him that Account No. 17692470 was open and that the names of John Cross, Joyce Cassidy and Prince Zankli were on the account. (Trial Tr. at 476.) Appellants contends that Datcher's testimony about the bank employee's statements contained hearsay and was not admissible. In response, Qualley made only a bald assertion that the bank employee's statements were not hearsay.

We agree with the Appellants. Hearsay includes any oral or written assertion, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted. Fed. R. Evid. 801(a), (c). The bank employee's oral assertion that the names of Cross, Zankli and Joyce Cassidy appeared on account number 17692470 was not made while the employee was testifying at trial or a deposition. Furthermore, the bank employee's assertion was offered for the truth of the matter asserted; i.e., it was offered to prove that the names of John Cross, Prince Zankli and Joyce Cassidy all were in fact on that

---

[9]Spinner testified that he met with the Cassidys and the others at offices bearing the title of "Metropolitan Mortgage Corporation."

specific account. The trial court clearly erred, therefore, in admitting Datcher's testimony repeating those statements.

Qualley argues that any error in admitting the testimony was harmless because it was cumulative of other testimony from Datcher about the names on the account. Elsewhere in Datcher's deposition, Datcher stated that the account at FNB Maryland belonged to John Cross, Joyce Cassidy and Prince Zankli and that it was "their" account. (Trial Tr. at 473-74.) Qualley contends that this other testimony was based on Datcher's personal knowledge and argues that, because Appellants did not object to this other testimony as hearsay, they cannot challenge the bank employee's "confirming" statements as hearsay.

We disagree. Appellants <u>did</u> object to Datcher's other testimony as being <u>without foundation</u>. (App. of Appellants at 37.) The record contains no evidence from which one could infer that Datcher had any independent personal knowledge about whose names appeared on the account. Therefore, Datcher's testimony about the bank employee's statements is not merely "confirming" or "cumulative" and the trial court's error cannot be excused as "harmless" on that account. We will evaluate whether Appellants have established prejudice arising from this error in section C, *infra*.

2. Spinner Testimony

Among the excerpts from Spinner's deposition that were read to the jury are passages in which Spinner testified that (a) on several occasions, Prince Zankli answered the telephone at the Cassidys' office by saying "Clo-Tex"; (b) Prince

12

Zankli told Spinner that "We deal with Clo-Tex"; (c) one of the Cassidys said to Spinner "We need to wire the money to Clo-Tex so they can get the money to Rotterdam to release the oil"; and (d) Prince Zankli said that Clo-Tex shared an office with American Business International in Gaithersburg, Maryland. Appellants objected to these statements as hearsay. (Appellants' App. at 42-43, 49-51; Defs.' Mot. in Limine to Exclude Testimony of Rudolph Datcher & Nathaniel Spinner.) The trial court reserved ruling on Appellants motion in limine and made no express determination during trial as to whether the above statements were hearsay. In connection with Cross and Clo-Tex's post-trial motions, however, the trial court made a finding that "the plaintiff has shown by a preponderance of the evidence that a conspiracy existed and that the alleged hearsay statements offered through Spinner's . . . deposition testimony were made during the course of the conspiracy and in furtherance of it."[10] (Addendum to Appellants' Br. at 12.)

Appellants contend that the trial court erred in finding that there was sufficient evidence to establish the factual prerequisite for admitting the statements of Cassidys and Prince Zankli as co-conspirator admissions. Specifically, Appellants argue that the only evidence linking Cross and Clo-Tex to the Cassidys and Prince Zankli, aside from the statements themselves, were the payments from Datcher and Qualley deposited into Clo-Tex's account at FNB Maryland. In

_____

[10]The trial court also stated that the alleged hearsay statements offered through Datcher's testimony were made during the course of the conspiracy. However, we find no evidence in the record to support a finding that the bank employee, whose statements are discussed above in section B.1., was a participant with the Cassidys, Prince Zankli, and the others in the alleged conspiracy.

13

response, Qualley contends that there was enough evidence in the record to support the trial court's finding of a conspiracy.[11]

"To the extent that the admissibility of evidence is conditioned on the resolution of a second question . . . it is the function of the court to determine whether or not the condition has been fulfilled." Fed. R. Evid. 104(a), adv. ctte. notes. Rule 801(d)(2)(E) provides that a statement is not hearsay if "[t]he statement is offered against a party and is . . . (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."[12] Fed. R. Evid. 801(d)(2)(E). In deciding whether a declarant's statements are the admissions of the party-opponent under the co-conspirator rule, the court must determine that there was a conspiracy and the statements were made while both the declarant and the person against whom the statement is offered were part of the conspiracy.[13]

---

[11]Qualley also argues in passing that the statements are admissions of the parties opponent because they were made by Cross and Clo-Tex's agents, as provided for in Federal Rule of Evidence 801(d)(2)(D), or "that the other exceptions of Rule 803 of the Federal Rules of Evidence apply." We decline to address these conclusory arguments.

[12] The co-conspirator statement rule is not an "exception" to the hearsay rule, as the parties on appeal have stated in their briefs. Rather, it excludes certain statements from the definition of hearsay because they are deemed to be the admissions of a party opponent.

[13] Appellants also object that the trial court erred in failing to expressly address the admissibility of the challenged statements on the record before submitting the case to the jury. In United States v. Bell, 573 F.2d 1040 (8th Cir. 1978), this Court set out a series of steps to guide trial courts in evaluating whether statements are within the co-conspirator rule. Where a hearsay objection has been made and the proponent contends that it is admissible under the co-conspirator rule,

We have reviewed the entire trial record and conclude that the trial court's finding of a conspiracy between Zankli, the Cassidys, Cross and Clo-Tex in February and March of 1994 was clearly erroneous. "The contents of the statement shall be considered **but are not alone sufficient to establish** . . . **the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered** under subdivision (E)." Fed. R. Evid. 801(d)(2)(E) (emphasis added). Aside from the statements by Zankli and the Cassidys, there is no testimony tending to establish Cross and Clo-Tex's knowledge of and participation in the activities of Zankli and the Cassidys.[14] The only document linking Cross and Clo-Tex (on the one hand) with Zankli and the Cassidys (on the other hand) is a letter dated May 3, 1994, apparently from the

---

that statement may be conditionally admitted into evidence. However, at the conclusion of all the evidence, a trial court shall "make an explicit determination for the record regarding the admissibility of the statement." 573 F.2d at 1044. We agree with Appellants that the procedures set forth in <u>Bell</u> should have been followed so that, had the proponent of the statement failed to prove a conspiracy involving the declarant and the parties opponent, the trial court could have given a curative instruction. See <u>id.</u>

[14] Qualley points to several statements by Spinner (purportedly based upon Spinner's personal knowledge) to the effect that Cross and Clo-Tex were "in on the scam." From the record it appears that the only basis for Spinner's assertions is the hearsay to which Appellants objected. We agree with Appellants that Spinner's statements about whom Spinner believed to be involved in the scheme to defraud him lack independent foundation.

15

person at NNPC whom Qualley identified as "John West."[15]  This letter instructed

Allen Cassidy and "Prince" to wire transfer $21,000 to account number 17692470

at FNB Maryland to the attention of "John Cross for the order of Chief Kelly of Aba

Nigeria."[16]  (Ex. 107.)  One month later, Datcher's check for $21,000 was deposited

into account number 17692470 at FNB Maryland.

Even when considered together with the contents of the statements

themselves, this evidence is not sufficient to establish, by a preponderance of the

evidence, that Prince Zankli and the Cassidys were participants in a conspiracy with

Cross and Clo-Tex and that the statements made to Spinner were made as part of

and in furtherance of the conspiracy.  Accordingly, the statements are not admissible

under the co-conspirator provision of the rule on admissions of party opponents.

We address the prejudice arising from the erroneous admission of the Spinner

testimony below.

---

[15] Exhibit 103, a document the Cassidys provided to Spinner, appears to be a portion of a 1991 contract between the Cassidys' company -- ABI -- and the NNPC. It contains no reference to Cross or Clo-Tex.

[16] Exhibit 107 is a collection of letters dating from between April 14, 1993 and May 31, 1994, which were given to Datcher's attorney.

C.    Harmless error

To determine whether the evidentiary errors discussed above prejudicially influenced the outcome of the case, we look to the jury's verdict. See Lovett, 201 F.3d at 1080. The parties have a right to untainted jury deliberations and a verdict which is based upon admissible evidence. See Nichols v. American Nat'l Ins. Co., 154 F.3d 875, 890 (8th Cir. 1998) (citing Crane v. Crest Tankers, Inc., 47 F.3d 292, 296(8th Cir.1995)); see also Drabik v. Stanley-Bostitch, Inc., 997 F.2d 496 (8th Cir. 1993); Hale v. Firestone Tire & Rubber Co., 756 F.2d 1322, 1333 (8th Cir. 1985). Here, the jury awarded Qualley one million dollars in punitive damages, yet also found that Clo-Tex's wrongdoing was not directed specifically at Qualley. (Addendum to Appellants' Br. at 4.) To make such a finding, the jury had to look beyond the events as to which Qualley himself testified, to the judicially noticed facts and to the Datcher and Spinner hearsay which purported to linked Zankli and the Cassidys to Clo-Tex and Cross.

This evidence, which was erroneously submitted to the jury, had a prejudicial impact upon the jury's consideration of this case. "Legislative facts," such as those judicially noticed in this case, are "[i]n the great mass of cases decided by courts . . . either absent or unimportant or interstitial, because in most cases, the applicable

17

law and policy have been previously established." Gould, 536 F.2d at 220 (quoting

2 Kenneth Davis, Administrative Law Treatise § 15.03 (1958)). The law and policy

in this case are established. However, both during the trial and in the final

instructions, the trial court instructed the jury pursuant to Federal Rule of Evidence

201(g) that it must accept the judicially noticed facts as proven.[17] (Trial Tr. at 483;

Final Jury Instruction No. 6). Thus, the trial court interjected legislative facts --

facts not within the jury's fact-finding province -- into the jury's deliberations by

telling the jury that they must treat those facts as conclusively proven. Furthermore,

the inadmissible hearsay from Datcher was the subject of a question from the jury

seeking to confirm that Cross, Zankli and Cassidy's names were on the account into

which Datcher's funds and the Eriksen wire transfers were deposited. (Appendix of

---

[17] Qualley argues that the judicially noticed facts were relevant to (a) Cross' credibility in claiming that he and Clo-Tex did not know the funds from Qualley were obtained by fraudulent means; and (b) the propriety and amount of the punitive damages. Because we conclude that the existence of Nigerian fraud schemes and, in some, the use of phony oil shipments, are not "adjudicative facts," we do not address the relevancy of the exhibits that underlie those findings.

The evidence that supported the judicially noticed facts has the potential to lead to stereotyping based on national origin. Obviously, not all persons of Sicilian descent are involved in the Mafia; nor are all Irish immigrants who solicit funds for "children's relief efforts" raising money for terrorist activities in Northern Ireland. If the trial court is asked on remand to consider the admissibility of the news articles and other exhibits, we assume that it will carefully weigh both the probative value of those exhibits and the potential for jury confusion or other prejudice arising from that evidence.

Appellants at 62.) Datcher's testimony, together with the challenged Spinner testimony, constituted the bulk of the evidence offered to support Qualley's claim that Clo-Tex and Cross knew of and/or participated in the fraudulent behavior of others.

Qualley bears the ultimate burden of persuasion as to his claims under RICO and the common law. Appellants are entitled to have the jury evaluate those claims by the greater weight of the admissible evidence. A substantial right of the Appellants was affected by the trial court's evidentiary errors. Those errors constituted an abuse of discretion and were not harmless.

## III.

Based upon the foregoing and our review of the record in this case, we reverse the trial court's rulings on the evidentiary issues raised on appeal. Furthermore, in light of this Court's resolution of the evidentiary issues raised on appeal, we cannot say that there is sufficient evidence to support an award of punitive damages in the amount of $1,000,000.00. See Economy Roofing & Insulating Co. v. Zumaris, 538 N.W.2d 641, 653-55 (Iowa 1995) and Wilson v. IBP, Inc., 558 N.W.2d 132, 144-48 (Iowa 1996), cert. denied sub nom. IBP, Inc. v. Wilson, 522 U.S. 810 (1997). Accordingly, we vacate the judgment, including the

19

award of punitive damages, and remand this case to the district court for a new trial,

consistent with this Court's rulings, on all of the issues.[18]

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[18] In light of our decision to remand the case, we decline to address whether a jury instruction on the doctrine of in pari delicto should be given in the new trial -- that determination must be made in light of all of the admissible evidence submitted to the district court on retrial. Similarly, we decline to address whether there will be sufficient evidence to substantiate the inclusion of the Eriksen wire transfers in a jury's actual damage award.