**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 16, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

MARVIN IVERSON,

      Defendant - Appellant.

No. 14-8071

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. No. 1:12-CR-00245-ABJ-1)**

Grant Russell Smith, Research and Writing Specialist, Cheyenne, Wyoming (Virginia L. Grady, Federal Public Defender, Districts of Colorado and Wyoming, Jim Barrett, Assistant Federal Public Defender, Cheyenne, Wyoming, with him on the briefs), for Defendant - Appellant.

Jason M. Conder, Assistant United States Attorney (Christopher A. Crofts, United States Attorney, District of Wyoming, Stephanie I. Sprecher and David A. Kubichek, Assistant United States Attorneys, on the brief), District of Wyoming, Casper, Wyoming, for Plaintiff – Appellee.

Before **HARTZ**, **O'BRIEN**, and **PHILLIPS**, Circuit Judges.

**HARTZ**, Circuit Judge.

Defendant Marvin Iverson was convicted after a jury trial of engaging in a scheme to defraud JPMorgan Chase and Big Horn Federal Savings. *See* 18 U.S.C. § 1344. The statute requires that the victims be "financial institutions." *Id.* To establish that element of the offense, the government offered the testimony of an FBI agent to try to prove that JPMorgan and Big Horn were insured by the Federal Deposit Insurance Corporation (FDIC). *See id.* § 20(1) (defining *financial institution* to include "an insured depository institution (as defined in [12 U.S.C. § 1813(c)(2)])"); 12 U.S.C. § 1813(c)(2) ("The term 'insured depository institution' means any bank or savings association the deposits of which are insured by the [FDIC] pursuant to this chapter.").

On appeal Defendant argues that the agent's testimony was inadmissible hearsay and violated the best-evidence rule. He also argues that even if the evidence was admissible, it was insufficient to prove that JPMorgan and Big Horn had FDIC insurance at the time of the offense. Despite the government's concession to the contrary, we hold that the agent's testimony was not inadmissible hearsay; it was either not hearsay or fell within a hearsay exception. As for the best-evidence rule, Defendant did not raise the issue below and he has not shown plain error. Finally, because there was sufficient evidence that JPMorgan had FDIC insurance at the time of the offense, we reject Defendant's sufficiency-of-the-evidence challenge.

I.      **BACKGROUND**

Defendant has been a member of the "sovereign citizens" group called "Wyoming Free State." Among other practices, such groups instruct their members on various debt-

elimination schemes. The scheme here was called the electronic-funds-transfers (EFT) scheme. A member writes a check on a closed account to pay off a debt, with the hope that an unaware financial institution will release title or a lien before the check bounces.

Defendant used the EFT scheme to try to eliminate debts owed to JPMorgan and Big Horn. First, on June 22, 2012, using a closed checking account with First Interstate Bank, Defendant wrote Big Horn two checks totaling over $27,000 to pay off a vehicle loan and a mortgage. On the back of each check was written:

> Not for deposit
> EFT ONLY
> For discharge of debt
> Marvin Leslie Iverson
> Authorized representative
> Without Recourse

R., Vol. 2 at 28 (internal quotation marks omitted). Despite this notation, the checks were processed by Big Horn, and the vehicle lien and mortgage were released. After being notified that the checks were drawn on a closed account, the bank demanded that Defendant pay the debt. Defendant refused until he was arrested for this offense. Second, on August 18, 2012, Defendant wrote a check from his closed First Interstate account to JPMorgan in the amount of $369,300 to pay off his daughter's mortgage. The check had the same EFT notation as before. JPMorgan did not process the check or release the mortgage.

Defendant was charged with scheming to defraud the financial institutions in a one-count indictment filed in the United States District Court for the District of

3

Wyoming.  The case went to trial on July 28, 2014.  Defendant represented himself with the aid of standby counsel.

Defendant's issues on appeal focus on the prosecutor's afterthought questioning of FBI Special Agent Kent Smith:

> [PROSECUTOR]:  I don't have any other questions.  Thank you.
> [DEFENDANT]:  No questions.
> THE COURT:  You may step down.
> [PROSECUTOR]:  Your Honor, I neglected to ask one question.
> THE COURT:  Very well.
> . . . .
> Q.  Agent, did you do any research to determine whether or not JPMorgan Chase and Black—or Big Horn Federal Savings were FDIC insured or federally insured institutions?
> A.  Yes, and both First Interstate—you said Big Horn?
> Q.  Big Horn.
> A.  Yes, Big Horn Federal Savings is.  I received the F—
> [DEFENDANT]:  Objection.  Foundation.
> THE COURT:  Sustained.
> . . . .
> Q.  What research did you do?
> A.  Different for different banks.  On JPMorgan Chase I pulled up the FDIC website and found their information and their certificate number.  For Big Horn Federal Savings Bank, having been to that actual bank, I requested a copy of their FDIC certificate which included their number.
> Q.  All right.  I ask again.  Can you—when you, when you looked at the website—
> [DEFENDANT]:  Objection.
> [Standby Defense Counsel]:  Hearsay.
> . . . .
> Q.  —is that a normal course of business to check to see if a bank is FDIC insured—
> [DEFENDANT]:  Hearsay.
> . . . .
> Q.  —in your normal course of business as an FBI agent?
> A.  To determine if they're FDIC insured?
> Q.  Yes.
> A.  Yes, it is.

4

Q. And do you rely on those records to be accurate to determine if a bank is FDIC insured?
A. Yes, we do.
Q. And I'd ask again. Do you know if the banks of Big Horn Federal Savings and—
[DEFENDANT]: Objection.
. . . .
Q. —JPMorgan Chase are federally insured?
[DEFENDANT]: Hearsay again.
THE COURT: Overruled.
A. Yes, in my research both Big Horn Federal Savings Bank and JPMorgan Chase bank are federally insured.

R., Vol. 3 at 84–86.

## II. DISCUSSION

### A. Admissibility of the Evidence

Defendant raises two challenges to the admissibility of the testimony that the victim institutions were FDIC insured. He claims (1) that Agent Smith's testimony about FDIC insurance coverage was hearsay and (2) the testimony violated the best-evidence rule, which required introduction into evidence of the FDIC certificates of coverage. Both the hearsay rule and the best-evidence rule are exceptions to the general rule that a witness can testify to what the witness saw or heard. The hearsay rule ordinarily excludes testimony about what someone wrote or said out of court when "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). And the best-evidence rule ordinarily excludes testimony about what appeared in a document when offered to prove "its content." Fed. R. Evid. 1002.

We review a district court's evidentiary decisions for abuse of discretion. *See United States v. Trujillo*, 136 F.3d 1388, 1395 (10th Cir. 1998). The government

5

confesses error on Defendant's hearsay issues, but we are not bound by this concession. *See United States v. Resendiz-Patino*, 420 F.3d 1177, 1182–83 (10th Cir. 2005). We first address hearsay and then the best-evidence rule.

### 1. Hearsay

Agent Smith's testimony about Big Horn's FDIC-insured status was based solely upon his review of the bank's FDIC certificate. In essence he was reporting on what the certificate said. His testimony about JPMorgan was based on his review of the FDIC website. There are two possible assertions in this testimony. One is Agent Smith's assertion that he is accurately reporting what he saw concerning the certificate and the website. The other is what the certificate and website said was true—that the banks were insured by the FDIC. The first assertion presents no hearsay problem because the assertion is made by the witness at trial. *See* Fed. R. Evid. 801(c)(1) (hearsay is limited to "a statement that . . . the declarant does not make while testifying at the current trial or hearing"). Agent Smith could be carefully cross-examined about the accuracy of his perception and memory of what he saw. (The probability of witness error in reporting the content of a document is, however, a concern of the best-evidence rule, which we address in the next section.)[1] Thus, the only hearsay issues are whether the statements in the

---

[1]The dissent argues that the essential hearsay problem at trial was the prosecution's failure to bring the certificate (or printout of the FDIC website) to the courtroom. But if that is a *hearsay* problem, rather than a best-evidence problem, what would happen if a fire destroyed the certificate or a power failure obliterated the website? Under the best-evidence rule, a witness could then testify about the contents of the lost records. *See* Fed.

Continued . . .

6

certificate and on the website were hearsay; and if so, did they come within an exception to the hearsay rule. We begin with the Big Horn testimony.

### a. Big Horn's FDIC Certificate

Although this circuit has not yet considered a hearsay challenge to the admission into evidence of the content of an FDIC insurance certificate, several of our sister circuits have. Each has rejected the hearsay objection, albeit for differing reasons. The First Circuit affirmed the admission of an FDIC certificate to prove insurance coverage under Fed. R. Evid. 803(6), the business-records exception. *See United States v. Albert*, 773 F.2d 386, 388–89 (1st Cir. 1985). The Sixth Circuit has likewise held that an FDIC certificate qualifies as a business record, *see United States v. Riley*, 435 F.2d 725, 726 (6th Cir. 1970), but it also has held one admissible as a public record under Fed. R. Evid. 803(8), *see United States v. Arthur*, 822 F.2d 60 at *3 (6th Cir. 1987) (unpublished). And the Ninth Circuit has held that the certificate is not hearsay because it is a "verbal act." *See United States v. Bellucci*, 995 F.2d 157, 160–61 (9th Cir. 1993). The parties have not cited nor have we found any case holding that FDIC certificates are inadmissible hearsay. For the following reasons, we reject Defendant's contention that they are.

The Ninth Circuit may well be correct that the assertion of insurance coverage in an FDIC certificate is not hearsay. The rule against hearsay does not apply to "verbal acts . . . in which the statement itself affects the legal rights of the parties or is a

R. Evid. 1004(a). Would the dissent nevertheless bar the testimony as hearsay? (The dissent agrees that Defendant has forfeited the best-evidence argument.)

7

circumstance bearing on conduct affecting their rights." Fed. R. Evid. 801 advisory committee's note to 1972 proposed rules, subdivision (c) (internal quotation marks omitted); *see id.* ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."). The issue is whether evidence that the statement was made is in itself relevant to a material issue in the case. For example, the statement may be the predicate for a defamation claim; if so, the statement is not being offered for its truth (it is actionable because it is *false*) and is not hearsay. Or a promise to do something may be offered into evidence to prove the existence of a contract even if the promisor was insincere in making the promise. The promise is not offered into evidence to prove the "truth" of the promisor's statement. The promise itself has independent legal significance, so there is no hearsay issue. *Cf. Creaghe v. Iowa Home Mut. Cas. Co.*, 323 F.2d 981, 984 (10th Cir. 1963) ("The hearsay rule does not exclude *relevant* testimony as to what the contracting parties said with respect to the making or the terms of an oral agreement. The presence or absence of such words and statements of themselves are part of the issues in the case."). In both circumstances, the evidence of the statement is not being used to prove the truth of some assertion but "merely to show that it was actually made." 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 801.11[3] (Mark S. Brodin ed., 2d ed. 2015). Apparently on that basis the Ninth Circuit wrote, "Like a written contract that memorializes the fact of a legal agreement, the [FDIC] certificate memorializes the fact of the legal relationship of insurer and insured."

8

*Bellucci*, 995 F.2d at 161.  If the certificate has independent legal significance—say, a bank's deposits are insured if and only if the certificate is issued (regardless of whether the premium was paid or the coverage was approved by the proper official)—then we could comfortably conclude that the statement of coverage on the certificate is not hearsay.  The statement would not be *evidence* of coverage; it would be what effectuates coverage.

But we need not resolve the legal effect of the certificate itself and whether its content has independent legal significance.  Even if the FDIC certificate is merely evidence of—that is, an assertion of—coverage, it easily qualifies as a public record under Fed. R. Evid. 803(8), because it officially reports that the FDIC has initiated coverage.  *See Arthur*, 822 F.2d 60 at *3.  Under the Rule 803(8) exception to the hearsay rule, "[a] record or statement of a public office," is admissible if "it sets out . . . the office's activities . . . and . . . the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."  There is no question that the certificate is a record or statement of the FDIC or that the FDIC is a public office.  And the certificate clearly sets out the FDIC's action—providing insurance to depositors of the institution named in the certificate.  The certificate therefore satisfies Rule 803(8). *See Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 542 (4th Cir. 2007) (county tax assessment, offered to prove home value, was properly admitted under Rule 803(8)); *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1366, 1371–72 (Fed. Cir. 1991) (certificate of correction issued by United States Patent &

Trademark Office admissible under Rule 803(8)); *United States v. Kuzmenko*, No. 2:13-cr-00062 JAM, 2014 WL 1334003, at *3 (E.D. Cal. April 3, 2014) (driver's license). Foundation testimony is usually unnecessary for admissibility under Rule 803(8). *See* 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 803.10[2] (Mark S. Brodin ed., 2d ed. 2015) ("Since the assurances of accuracy are generally greater for public records than for regular business records, the proponent is usually not required to establish their admissibility through foundation testimony.").

### b. The FDIC Website

Agent Smith's testimony regarding JPMorgan's insurance status was based solely on his review of the FDIC website. He testified that he looked up JPMorgan on the website, "found their information and their certificate number," and determined that it "[is] federally insured," R., Vol. 3 at 85. What the website reports amounts to an assertion that JPMorgan has an FDIC certificate with a particular certificate number and that the insurance remains active. The government was attempting to prove the truth of that assertion. There is no argument that the website itself affects an institution's legal rights (as perhaps may be true of a certificate), so we agree with Defendant that Agent Smith's testimony offered the website content for its truth and was hearsay.

Again, however, the public-records exception applies. The website information is "a record or statement of [the FDIC]." Fed. R. Evid. 803(8). And the website reports which banks are insured by the FDIC, thereby "set[ting] out . . . the office's activities" related to deposit insurance. *Id.* Several courts have ruled that government websites fall

10

within the exception for public records. *See, e.g.*, *Williams v. Long*, 585 F. Supp. 2d 679, 689–91 (D. Md. 2008) (judicial record of pending lawsuits against defendant); *Chapman v. S.F. Newspaper Agency*, No. C 01-02305 CRB, 2002 WL 31119944, at *2 (N.D. Cal. Sept. 20, 2002) (printout of delivery confirmation from United States Postal Service "Track & Confirm" webpage); *EEOC v. E.I. DuPont de Nemours & Co.*, No. CIV.A. 03-1605, 2004 WL 2347559, at *1 (E.D. La. Oct. 18, 2004) ("table of information compiled by the United States Census Bureau" printed from Census Bureau website). Government records, statements, and reports are continually being placed on the internet to allow easy access to the general public. Their electronic format does not, by itself, prevent them from qualifying as public records. *See* Fed. R. Evid. 101(b)(6) ("a reference to any kind of written material or any other medium includes electronically stored information"); Fed. R. Evid. 101(d) (the term *original* includes electronically stored information in any form "readable by sight"). And courts have considered the FDIC website so reliable that they have taken judicial notice of information on it. *See, e.g.*, *Laborers' Pension Fund v. Blackmore Sewer Const., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002) (bank is branch office of another bank); *FAS Capital, LLC v. Carr*, 7 F. Supp. 3d 1259, 1267 (N.D. Ga. 2014) (FDIC was receiver of closed bank); *Curcio v. Wachovia Mortg. Corp.*, No. 09-CV-1498-IEG (NLS), 2009 WL 3320499, at *4 (S.D. Cal. Oct. 14, 2009) (bank was regulated by Office of Thrift Supervision on date of transaction). We hold that because Agent Smith's testimony about the FDIC certificates was either not hearsay or fell within the public-records exception and because his testimony about the FDIC website fell within the

11

public-records exception, the district court did not abuse its discretion in overruling Defendant's hearsay objections.

We recognize that the government did not argue that Agent Smith's testimony about FDIC insurance coverage was admissible under the Rule 803(8) exception to the hearsay rule. But we see no unfairness to Defendant in affirming the district court's decision to overrule Defendant's hearsay objection on that ground. The legal issue is clear. And it is not dependent on any disputable factual foundation. (The dissent objects that Agent Smith did not bring to court the documents he reported about—the Big Horn FDIC certificate and, apparently, a printout from the FDIC website content on JPMorgan. But Defendant did not object to Smith's testimony on that ground. And the trial court could properly credit his testimony about what he saw. Further, we can take judicial notice of the facts necessary to establish the foundation for the admission of the testimony. *See* Fed. R. Evid. 104(a) (preliminary questions of admissibility of evidence are decided by court).)

Therefore, our rejection of the hearsay argument comes within our general rule that we may affirm on an unpreserved ground if doing so is fair to appellant. *See United States v. Harrison*, 296 F.3d 994, 1001 (10th Cir. 2002). We cannot express the point better than Judge Brorby did in *Hernandez v. Starbuck*, 69 F.3d 1089, 1093–94 (10th Cir. 1995):

> [The Appellant's] argument misconceives the roles played by the appellant, the appellee, and the court of appeals when a district court judgment is appealed. While the appellant challenges the district court's ruling, the appellee is only interested in maintaining the status quo, *i.e.,* an affirmance. Because the appellant

12

comes to the court of appeals as the challenger, he bears the burden of demonstrating the alleged error and the precise relief sought. A court of appeals is not required to manufacture an appellant's argument on appeal when it has failed in its burden to draw our attention to the error below. In the event of such a failure, the court will ordinarily consider the appellant's point waived. Appellees bear no such burden. Though Fed.R.App.P. 28(b) requires the appellee's brief to contain arguments addressing the issues raised by the appellant, we have never characterized the appellee's obligation in terms of a categorical imperative. The distinction between appellant's and appellees' obligations under Rule 28 grows out of the court of appeals' freedom to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court. This broad power to affirm extends beyond the counter-arguments raised by the appellee; it includes any ground for which there is record to support conclusions of law. *Once the appellant alleges the district court erred, we have a duty to assess the validity of the appellant's allegations*. This duty arises in part out of our relationship with the district court, and *we may not neglect it simply because an appellee fails to defend adequately the district court's decision. To do so would open the door to a perverse jurisprudence by which properly decided district court decisions could be reversed*.

(brackets, citations, footnote, and internal quotation marks omitted) (emphasis added).

We also repeat his caution to appellees: "We admonish appellees not to take our language as a license not to address appellant's arguments. The appellee's brief plays a vital function in informing the court of the weaknesses in the appellant's arguments. By failing to address a ground for relief raised by the appellant, the appellee greatly increases the chances the court of appeals will be persuaded by the appellant's position." *Id*. at 1094 n.3.

## 2. Best-Evidence Rule

Defendant also challenges the introduction of Agent Smith's testimony as a violation of the best-evidence rule. Because Defendant failed to raise this objection in the district court, we review only for plain error. *See United States v. Frost*, 684 F.3d

963, 971 (10th Cir. 2012).  We will grant relief under the plain-error standard only if (1) the district court committed an error, (2) the error is clear at the time of the appeal, (3) the error "affects substantial rights," and (4) the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Id.* (internal quotation marks omitted).  An error is *clear* "when it is contrary to well-settled law."  *United States v. Whitney*, 229 F.3d 1296, 1309 (10th Cir. 2000).  It affects substantial rights only "when it is prejudicial, meaning that there is a reasonable probability that, but for the error claimed, the result of the proceeding would have been different."  *United States v. Algarate-Valencia*, 550 F.3d 1238, 1242 (10th Cir. 2008) (internal quotation marks omitted).

Fed. R. Evid. 1002 provides that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise."  *See Allen v. W. H. O. Alfalfa Milling Co.*, 272 F.2d 98, 99 (10th Cir. 1959) ("[C]ourts exclude testimony when the knowledge from which the witness testifies is derived from the writing.").  Defendant argues that Agent Smith's testimony plainly violated this rule because "[t]he original writings at issue here are the FDIC certificates," and therefore "[s]ubstituting Agent Smith's testimony for the actual certificates" was not permissible absent an exception to the best-evidence rule.  Aplt. Br. at 15.

We need not decide if the testimony violated the best-evidence rule, because even if there was error, it was not clear.  The best-evidence rule does not apply to testimony relating to the *existence* of a document, as opposed to its contents.  *See* Fed. R. Evid.

14

1002 (an original is required "to prove its *content*" (emphasis added)).  For example, in *United States v. Beebe*, 467 F.2d 222, 225 (10th Cir. 1972), we held that the best-evidence rule did not prevent witnesses from testifying "that their businesses were 'licensed dealers' in firearms rather than producing documents evidencing their actual licensing."  We noted that because the government "was not attempting to establish the terms of [the licenses,] . . . no useful reason would have been served by their production."  *Id*.  After all, the purpose of the best-evidence rule is to protect against error in reporting details about a document.  As one treatise puts it:  "The Best Evidence doctrine also does not apply to evidence of written transactions where the purpose is to prove simply the 'bottom line,' meaning the net effect or overall nature of the transaction, or the fact that such a transaction occurred, without reference to details or specifics."  5 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 10:19 at 717–19 (4th ed. 2013).

At least one circuit has applied this reasoning to testimony about FDIC-insured status.  In *United States v. Sliker*, 751 F.2d 477, 483 (2d Cir. 1984), the Second Circuit affirmed the admission of testimony "that the bank's deposits 'are' FDIC insured" against the objection "that the best evidence rule required the Government to produce a certified copy of the insurance policy itself."  The court ruled that the evidence should not be excluded under Fed. R. Evid. 1002 because "the proof required was proof of the fact of insurance and not of the contents of a writing."  *Sliker*, 751 F.2d at 483.  This decision also raises doubt that the best-evidence rule required exclusion of Agent Smith's testimony.

15

Because the admission of similar testimony has been affirmed against a best-evidence- rule objection in our sister circuit and follows our precedent in an analogous context, we cannot say any error is clear. *See United States v. Teague*, 443 F.3d 1310, 1319 (10th Cir. 2006) ("If neither the Supreme Court nor the Tenth Circuit has ruled on the subject, we cannot find plain error if the authority in other circuits is split."); *United States v. Ruiz-Gea*, 340 F.3d 1181, 1187 (10th Cir. 2003) ("In general, for an error to be contrary to well-settled law, either the Supreme Court or this court must have addressed the issue."); *United States v. Rickett*, 535 F. App'x 668, 677 (10th Cir. 2013) ("[T]o render an alleged error 'clear' or 'obvious,' Mr. Rickett needs controlling Supreme Court or Tenth Circuit precedent, or a hefty weight of controlling authority from other circuits." (emphasis omitted)). We therefore reject Defendant's best-evidence-rule argument.

## B. Sufficiency of the Evidence

Even though Agent Smith's testimony was admissible, we must still decide whether the evidence was sufficient to sustain the jury's verdict that JPMorgan and Big Horn were FDIC insured when Defendant committed the charged acts. Viewing the evidence in the light most favorable to the government, *United States v. Cooper*, 375 F.3d 1041, 1044 (10th Cir. 2004), we hold that the evidence was sufficient to find that JPMorgan was FDIC insured on the relevant date. Because that is enough to sustain the conviction, we affirm.

At the outset we note that a bank's status as an FDIC-insured institution on the date of the crime is an element of federal bank fraud that must be proved to the jury

16

beyond a reasonable doubt. *See United States v. Rackley*, 986 F.2d 1357, 1360–61 (10th Cir. 1993) ("In order to convict the defendant of bank fraud under 18 U.S.C. § 1344, the government was required to prove . . . that the financial institution was then insured by the [FDIC]."). Despite the importance of this element, this case is just one of many in which the government has treated proof of FDIC-insured status as an afterthought. We continue to be "troubled by the government's casual treatment of this element." *United States v. Bindley*, 157 F.3d 1235, 1239 (10th Cir. 1998). Proof is not difficult. The FDIC could not make it easier. Its website states that it can "assist prosecutors who need to prove an institution's insured status under a criminal statute by providing a 'proof' of insured status." FDIC, *Instructions for Requesting Confirmation that an Institution was FDIC-Insured on the Date of an Offense* (July 2, 2011), https://www.fdic.gov/bank/individual/failed/ProofofFDICInsuredStatus.html (last visited Nov. 13, 2015). All a prosecutor need do is send a fax to the number provided and the FDIC will provide a statement of coverage at the relevant time. *See id;* Ex. 1 at 2.[2]

To be sure, the evidence in this case was not as strong as the website procedure would have yielded. But viewed in the light most favorable to the government, it was sufficient. Regarding JPMorgan, Agent Smith testified that "in [his] research . . .

---

[2] There may even be easier ways to prove a bank's FDIC-insured status using the FDIC website. Given how simple the FDIC has made it for a prosecutor to prove coverage, we do not expect to see another case like this in this circuit. If we cannot rely on the assistant United States attorneys with their law degrees to obtain this evidence, perhaps we can at least rely on the FBI to deposit it in the prosecutor's lap.

JPMorgan Chase bank [is] federally insured." R., Vol. 3 at 86. He described that research as "pull[ing] up the FDIC website and [finding] their information and their certificate number." *Id*. at 85.[3] He said that checking the FDIC website to determine whether a bank is FDIC insured is part of his "normal course of business as an FBI agent." *Id*. at 86. From this testimony a jury could reasonably infer that when Agent Smith accessed the FDIC website, he read entries showing that JPMorgan was insured by the FDIC on that date. And if the date that Smith checked the website was sufficiently close to the time of Defendant's offense, the jury could also reasonably infer that the bank was insured at the time of Defendant's offense. *See Sliker*, 751 F.2d at 484–85 (noting "the principle that the subsequent existence of a condition is some evidence of its prior existence, at least when the time span is not too great and there is no suggestion of an intervening circumstance that might call its previous existence into question," and holding that testimony that bank "is" FDIC insured (at time of trial) permitted jury to infer that bank was insured at time of crime (more than three years earlier, *see id.* at 480, 496)). *Compare United States v. Ware*, 416 F.3d 1118, 1122 (9th Cir. 2005) (less than

---

[3] The FDIC website provides a "BankFind" tool by which anyone can research the FDIC status of an individual bank. *See* FDIC, BankFind, *https://research.fdic.gov/bankfind/* (last visited Feb. 5, 2016). This tool permits searching for FDIC-insured banking institutions by bank name, FDIC number, or location. *See id*. Once a bank is selected, the website provides various information about the bank, including FDIC status (active or inactive), FDIC certificate number, when the bank was established, and when it was first insured. *See* FDIC, BankFind: JPMorgan Chase Bank, National Association (FDIC #: 628), https://research.fdic.gov/bankfind/detail.html?bank=628&name=JPMorgan%20 Chase%20Bank,%20National%20Association (last visited Feb. 5, 2015). Links are also available that display the bank's locations, history, and financial data. *See id.*

six-month delay between crime and trial allows jury to infer "the existence of past insurance coverage from testimony of present insurance coverage"), *with United States v. Ali*, 266 F.3d 1242, 1244 (9th Cir. 2001) (no inference of FDIC coverage could be drawn based on testimony "solely in the present tense at trial, well over two years after the time of the alleged offense").

In this case the jury could draw a reasonable inference that Agent Smith checked the FDIC website within a few months of the offense. Defendant's offense against JPMorgan occurred in August 2012. Smith investigated the matter and arrested Defendant in October, although only on the charge of defrauding Big Horn. A superseding indictment handed down in March 2013 included the charge of defrauding JPMorgan, which was described as a "federally insured financial institution[]," R., Vol. 1 at 66. (It appears that the jury was given a date-stamped copy of the indictment.) A jury could infer that Agent Smith conducted his research on JPMorgan's FDIC insurance before that indictment issued, about seven months after the offense. In our view, that time lapse is sufficiently short that the jury could infer FDIC insurance coverage in the summer of 2012. *See United States v. Brunson*, 907 F.2d 117, 119 (10th Cir. 1990) (relying in part on documentary evidence showing federal insurance coverage seven months after the crime as circumstantial evidence of insurance on the date of the crime).

Moreover, our examination of the trial exhibits reveals two mortgage-loan statements—dated July 30, 2012, and August 31, 2012—which both include the notation "JPMorgan Chase Bank, N.A. Member FDIC." *United States v. Iverson*, No. 12-CR-

19

245-J, Trial Ex. 500 at 9–10, 13–14 (D. Wyo. 2012). These documents, admitted without objection as business records of the bank, are strong corroboration that JPMorgan was FDIC insured both immediately before and immediately after the offense occurred. *See United States v. Pascarella*, 84 F.3d 61, 71 (2d Cir. 1996) (finding sufficient evidence of bank's FDIC insurance in part based on Defendant's "bank statements stat[ing] that the bank was so insured"). In all, we are satisfied that the evidence regarding JPMorgan's FDIC status was sufficient to support a jury finding that JPMorgan was FDIC insured on the date of the offense.

Because there was sufficient evidence that JPMorgan was FDIC insured on the date of the offense, we need not address Defendant's argument that there was insufficient evidence of Big Horn's coverage. Defendant's offense, a violation of 18 U.S.C. § 1344, requires defrauding only one financial institution, not two. We recognize that the indictment charged Defendant with defrauding both institutions. But indictments typically charge alternative means of committing an offense in the conjunctive. Doing so establishes that the grand jury found that the defendant probably committed the offense via *all* the alternative means. *See United States v. Daily*, 921 F.2d 994, 1001 (10th Cir. 1990) ("[I]t is generally accepted procedure to use 'and' in an indictment where a statute uses the word 'or.' This assures that defendants are not convicted on information not considered by the grand jury."), *overruled on other grounds by United States v. Gaudin,* 515 U.S. 506 (1995). This leaves to the petit jury to determine whether the government can prove *any* of the means. The jury instructions at trial typically describe

20

the means of committing the offense in the alternative and allow the jury to convict if it finds any of the means beyond a reasonable doubt. *See United States v. Earls*, 42 F.3d 1321, 1327 (10th Cir. 1994) ("[I]t is entirely proper for the district court to instruct the jury in the disjunctive, though the indictment is worded in the conjunctive." (internal quotation marks omitted)); *United States v. Gunter*, 546 F.2d 861, 868–69 (10th Cir. 1976) ("It is hornbook law that a crime denounced in the statute disjunctively may be alleged in an indictment in the conjunctive, and thereafter proven in the disjunctive."). If after conviction it is determined that there was insufficient evidence of guilt with respect to one of the alternative means, we presume that the jury did not base its verdict on that means and we will affirm if there was sufficient evidence of any of the other means. *See Griffin v. United States*, 502 U.S. 46, 56 (1991) ("Petitioner cites no case, and we are aware of none, in which we have set aside a general verdict because one of the possible bases of conviction was neither unconstitutional . . . nor even illegal . . . , but merely unsupported by sufficient evidence."); *United States v. Ayon Corrales*, 608 F.3d 654, 657 (10th Cir. 2010) ("[W]hen there is sufficient evidence to support a conviction on one theory of guilt on which the jury was properly instructed, we will not reverse the conviction on the ground that there was insufficient evidence to convict on an alternative ground on which the jury was instructed.").

On occasion, as here, the jury instructions unnecessarily set forth the means of committing the offense in the conjunctive (just as in the indictment), stating that the jury

21

must find that the defendant committed the offense through all the alleged means.[4]  In

that circumstance we have previously adopted what we have called the law of the case

regarding unobjected-to elements instructions in criminal prosecutions.  We have held

that each charged element, even if unnecessary, must be proved, and reversal is required

if there is insufficient evidence of any element.  *See, e.g.*, *United States v. Romero*, 136

F.3d 1268, 1273 (10th Cir. 1998); *United States v. Cronic*, 900 F.2d 1511, 1515 n.3 (10th

Cir. 1990); *United States v. Killip*, 819 F.2d 1542, 1547–48 (10th Cir. 1987); *United*

*States v. Biglow*, 554 F. App'x 679, 683–84 (10th Cir. 2014).  But those holdings have

---

[4] The jury was instructed that it must find that Defendant schemed to defraud "Big Horn
Federal Savings Bank *and* JPMorgan Chase Bank" and that "Big Horn Federal Savings
Bank *and* JPMorgan Chase Bank were insured by the [FDIC.]."  R., Vol. 1 at 115
(emphasis added).  Jury Instruction No. 18 told the jury:
> ….
>
> To find the defendant guilty of this crime you must be convinced
> that the government has proved each of the following beyond a reasonable
> doubt:
>
> First:  the defendant, Marvin Iverson, knowingly executed a scheme
> or artifice to obtain money or property from Big Horn Federal Savings
> Bank and JPMorgan Chase Bank by means of false or fraudulent pretenses,
> representations, or promises;
>
> Second:  Big Horn Federal Savings Bank and JPMorgan Chase Bank
> are financial institutions within the meaning of the law; in this case, that
> means the government must prove that Big Horn Federal Savings Bank and
> JPMorgan Chase Bank were insured by the Federal Deposit Insurance
> Corporation;
>
> Third:  the false or fraudulent pretenses, representations, or promises
> that the defendant made were material, meaning they would naturally tend
> to influence, or were capable of influencing the decision of the Big Horn
> Federal Savings Bank and the JPMorgan Chase Bank.

*Id.* at 115.

now been overruled by the Supreme Court's opinion in *Musacchio v. United States*, 136 S. Ct. 709 (2016), which held that "when a jury instruction sets forth all the elements of the charged crime but incorrectly adds one more element, a sufficiency challenge should be assessed against the elements of the charged crime, not against the erroneously heightened command in the jury instruction," *id.* at 715. The Court said that the law-of-the-case doctrine is inapplicable in this context, explaining that "the doctrine is something of a misnomer when used to describe how an appellate court assesses a lower court's rulings." *Id*. at 716 (internal quotation marks omitted). The doctrine "generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. . . . [But an] appellate court's function *is* to revisit matters decided in the trial court." *Id*. (internal quotation marks omitted).[5]

In short, the government adequately proved the offense charged in the indictment.

## III.   CONCLUSION

We AFFIRM the judgment below.

---

[5] The Court noted, however, that "[w]hen an appellate court reviews a matter on which a party failed to object below, its review may well be constrained by other doctrines such as waiver, forfeiture, and estoppel, as well as by the type of challenge that it is evaluating." *Id.* But no such considerations appear to have any purchase here. There is no hint that Defendant relied on the prosecution's having to prove its case with respect to both JPMorgan and Bighorn.

# EXHIBIT 1

Name
Address
City, State, Zip


Dear XXX:

By facsimile dated October 7, 2010, you requested proof of the insured status of Bank for the XXX time period.

In response to that request, we are enclosing a Certificate of Proof of Insured Status certifying that this institution was an insured depository institution. Also enclosed is a duplicate of the insurance certificate issued to this institution, which was in effect on the specified dates.

Please note that insurance certificates issued to a branch do not recite the specific geographic location of the branch. Instead, all insurance certificates issued to a federally insured depository institution reflect the institution's home/parent office location. This is because an institution's status as a federally insured depository institution encompasses its home office as well as each domestic branch office established by the institution. In other words, an insured depository institution's home office and all of its domestic branch offices are considered to be one entity for federal deposit insurance purposes under the Federal Deposit Insurance Act (FDI Act); funds deposited at a domestic branch office location are insured to the same extent as if they had been deposited at the institution's home office location instead.

Please review the enclosed documents upon receipt to make sure that they satisfy your requirements. If I can be of further assistance in this matter, please let me know.

Sincerely,



XXX
Counsel


Enclosures

# CERTIFICATE OF PROOF OF INSURED STATUS

1. I, XXX, hereby certify and attest that I am a Counsel at the Federal Deposit Insurance Corporation and that I have the official custody of the records of the Federal Deposit Insurance Corporation.

2. I further certify that the attached record pertaining to the admission and history of Bank, City, State, is an official record of the Corporation, and is attached hereto as Exhibit "A."

3. I further certify that insurance applicable to the main office of Bank, City, State, is applicable to any domestic (U.S.) branch office of Bank.

4. I further certify that, after diligent search, no record or entry in the official records of the Corporation has been found to exist which terminated the status of Bank, as an insured depository institution under the provisions of section 8 of the Federal Deposit Insurance Act, 12 U.S.C. 1818, and that Bank, retained its status as an insured depository institution of the Federal Deposit Insurance Corporation from Date through and including Date.

DATED:

(SEAL)

_____
                        XXX
                      Counsel
        FEDERAL DEPOSIT INSURANCE CORPORATION


CITY OF WASHINGTON      )
                        ) SS
DISTRICT OF COLUMBIA    )


        I,                          , a Notary Public in and for the
District of Columbia, hereby certify that XXX, whose signature
appears above, is personally known to me, that the said XXX is
Counsel at the Federal Deposit Insurance Corporation and has
custody of the official records of the Federal Deposit Insurance
Corporation which pertain to the insured status of depository
institutions, and that the signature above of the said XXX is
genuine.  I further certify that I have a seal of office and
have official duties in the District of Columbia where the said
XXX is employed and where the aforesaid official records are
kept.

        DATED:

        (SEAL)

                        _____
                                  NOTARY PUBLIC

                  My commission expires:_____

CERTIFICATION


I, XXX, Counsel at the Federal Deposit Insurance
Corporation, hereby certify and attest that the attached
duplicate copy of the certificate of insurance issued to Bank,
is a true and correct copy of the original.

DATED:

(SEAL)

_____

XXX
Counsel
FEDERAL DEPOSIT INSURANCE CORPORATION

EXCERPTS FROM FDIC RECORDS

Institution name

Raleigh
NC 27601-1974

Insurance date          11/03/1990
Certificate #
Former bank name
Former bank name
Actions                 Main office relocated from                    to
                                  , Raleigh, NC, effective 12/03/2008.

Actions                 Title changed from                 to                    ,
                        effective 04/05/2008.

Actions                 Main office relocated from                        Rock
                        Mount, NC, to                  , Raleigh, NC,
                        effective 10/12/2006.

Actions                 Title changed from '                 or '                    ,
                        effective 10/30/2001.

Actions                 Main office relocated from                         to
                                  Rocky Mount, NC, effective 06/18/2001.

Actions                         , Rocky Mount, NC, was admitted to membership
                        in the FDIC, effective 11/03/1990.

Classification          State member
Fund                    DIF

EXHIBIT "A"



# Federal Deposit Insurance Corporation
## 550 17th Street, NW
## WASHINGTON, DC 20429

## BRANCH HISTORY REPORT

Branch Uninum

Branch Status          C

Branch Active          Y

---

### FINANCIAL INSTITUTION

Raleigh, NC    27601-1974

|  |  |
|---|---|
| | CLASS/CATEGORY          SM/13 |
| CERTIFICATE NUMBER | PRIMARY FED          FED |
| INSTITUTION UNIQUE | PRIMARY INS FUND          DIF |

PREVIOUS UNIQUE NUMBER

---

### BRANCH                                    MAILING ADDRESS

LAGRANGE, GA 30240-0000

| | |
|---|---|
| SERVICE TYPE | 11 |
| EFFECTIVE DATE | 12/09/2006 |
| PROCESSED DATE | 12/21/2006 |
| TRANSACTION NUMBER | 200620580 |

ACTION
BRANCH ACQUIRED IN ABSORPTION/CONSOLIDATION/MERGER/FAILURE (713)

Exhibit "B"

# FEDERAL DEPOSIT INSURANCE CORPORATION

## WASHINGTON, D.C.

**DUPLICATE**

Hereby certifies that the deposits of each depositor in

**RALEIGH**

**NORTH CAROLINA**

are insured to the maximum amount provided by the

Federal Deposit Insurance Act



Attest: _____

EXECUTIVE SECRETARY

No: _____

In testimony whereof, witness my signature and the seal of the

Corporation this ___5TH___ day of ___APRIL, 2008___

_____

CHAIRMAN OF THE BOARD OF DIRECTORS

Case No. 14-8071, *United States of America v. Iverson*
**O'BRIEN**, J., concurring.

Of one thing there can be no doubt, or at least no reasonable doubt: the deposits in both Big Horn Federal Savings Bank (BHFSB) and JPMorgan Chase Bank (JPM) are now federally insured and were federally insured when Iverson committed these banking crimes. One can be sure of such things by going to the FDIC's official internet site. It directs inquiries about FDIC-insured institutions to its web pages: "FDIC BankFind allows you to locate FDIC-insured banking institutions."[1] And those pages do, indeed, show both banks to have been continuously insured for decades. For instance, all branches of BHFSB are federally insured and have been so insured since February 28, 1936.[2] *See* Appendix. The bank was established in 1935 as a Savings and Loan; in 1990 it changed its organizational type to "Mutual Savings Bank" and adopted its current name; and since July 2011 its regulatory agency has been the Comptroller of the Currency.[3] *Id.* Nothing on the website suggests a bank failure or a lapse in its federal

---

[1] https://research.fdic.gov/bankfind (last visited Feb. 25, 2016).

[2] https://research.fdic.gov/bankfind/detail.html?bank=29637&name=Big%20Horn%20Federal%20Savings%20Bank&searchName=BIG%20HORN%20FEDERAL%20SAVINGS%20BANK&searchFdic=&city=&state=WY&zip=&address=&searchWithin=&activeFlag=&tabId=2 (last visited Feb. 25, 2016).

[3] https://research.fdic.gov/bankfind/detail.html?bank=29637&name=Big%20Horn%20Federal%20Savings%20Bank&searchName=BIG%20HORN%20FEDERAL%20SAVINGS%20BANK&searchFdic=&city=&state=WY&zip=&address=&searchWithin=&activeFlag=&tabId=2 (last visited Feb. 25, 2016).

deposit insurance. *Id.* The same is true of JPM.[4] None of this can reasonably be questioned. This case is not even remotely about significant facts. Iverson has not claimed or even argued that the banks were not federally insured when he committed these crimes, only that the proof of their federally insured status was inadequate.

I join Judge Hartz's carefully crafted and compelling opinion. I write separately only to suggest an alternative basis for affirming. We can and should take judicial notice of the banks' federally insured status during the relevant events. Doing so elevates substance over form and eliminates the need to wrestle with arcane evidentiary issues.

## I.      Judicial Notice in General

A judge or court may notice facts "not subject to reasonable dispute" because either they are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Such notice may be taken upon motion or *sua sponte* and at any stage of the proceedings, even on appeal. Fed. R. Evid. 201(c),(d) & advisory committee's note (1972 Proposed Rules). It can be taken in both civil and criminal cases. But there is a difference—"[i]n a civil case, the court must instruct the jury to accept the noticed fact as conclusive" whereas in a criminal case the jury must be instructed "that it may or may not accept the noticed fact as conclusive." Fed. R. Evid. 201(f).

---

[4] JPM was also FDIC-insured on the date of the crime but because we need only one, *see Musacchio v. United States*, No. 14-1095 (U.S. Jan. 25, 2016), for simplicity I will only refer to BHFSB.

On that score the legislative history of Rule 201(f) is revealing: the civil/criminal divide came from Congress. *United States v. Jones*, 580 F.2d 219, 223 (6th Cir. 1978); *see also* 1 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 2:10 (4th ed. 2013). As the rule was originally proposed by the Supreme Court both civil and criminal juries would be instructed to accept judicially noticed facts as conclusive. *Id.* Congress rejected the proposal in favor of the current rule. *Id.* It was concerned that requiring a jury in a criminal case to accept as conclusive any judicially noticed fact would be "'inappropriate" as "contrary to the spirit of the Sixth Amendment right to a jury trial.'" *Jones*, 580 F.2d at 223 (quoting H. Rep. No. 93-650, 93rd Cong., 1st Sess. 6-7 (1973)). In doing so, it "intended to preserve the jury's traditional prerogative to ignore even uncontroverted facts in reaching a verdict" and to prevent a court from "effectively permitting a partial directed verdict as to facts in a criminal case."[5] *Id.* at 224. Accordingly, trial courts and appellate courts generally may not take post-trial judicial notice of adjudicative facts in a criminal case to support a judgment against the defendant.[6] Mueller & Kirkpatrick, *supra*, § 2:8, 2:10. But there is an important distinction.

---

[5] *See also* Mueller & Kirkpatrick, *supra*, § 2:10 ("Rule 201(f) as finally enacted is consistent with the well-established principle that a court cannot direct a verdict of guilty against a criminal defendant, in whole or in part, by instructing the jury to consider as proved a particular point or an element in a charge, no matter how conclusive the evidence. These limits on judicial control over juries in criminal cases have the effect of empowering juries to 'nullify' even the most strongly supported charges, and to acquit a defendant despite overwhelming or indisputable evidence of guilt.").

[6] Other concerns restrain an appellate court from taking judicial notice for the first time on appeal, whether in a civil or criminal case. Fact-finding is a trial court function.

(Continued . . .)

3

## II. Adjudicative Facts v. Legislative Facts

The rule applies only to "adjudicative" facts, not "legislative" facts. Fed. R. Evid. 201(a). We have described adjudicative facts as "simply the facts of the particular case" and legislative facts as those having "relevance to legal reasoning and the lawmaking process; they are established truths, facts or pronouncements that do not change from

Routine-taking of judicial notice on appeal would interfere with the trial courts' role as fact-finders. Mueller & Kirkpatrick, *supra*, § 2:8. It would also effectively relieve a party from its duty to present facts in a timely fashion at trial. *Id.*; *see also Garner v. Louisiana*, 368 U.S. 157, 173 (1961) (refusing to take judicial notice for first time on appeal of racial relations existing in South as proof that defendants' sit-in would "foreseeably disturb or alarm the public," an element of the charge; "[t]o extend the doctrine of judicial notice to the length pressed by the respondent would require us to allow the prosecution to do through argument to this Court what it is required by due process to do at the trial, and would be to turn the doctrine into a pretext for dispensing with the trial").

These are valid concerns, but only as to judicial notice of adjudicative facts, not legislative ones. As Mueller and Kirkpatrick explain:

> [J]udicial notice of adjudicative facts that help prove charges or defeat defenses on the merits is improper on appeal . . . even though failure of proof on the part of the prosecution generally bars retrial of the defendant. It is less clear [whether this proposition] should apply to post-trial judicial notice of facts relating to matters of subject matter jurisdiction or venue, as opposed to matters relating to culpability. . . . It is one thing to say that defendants in criminal cases are entitled to jury determinations, and to the protection provided by the standard of proof beyond a reasonable doubt, on elements relating to culpability. It is another thing to argue that defendants are entitled to such protections on points relating to the division of legislative responsibility between Congress and the states . . . .
>
> Perhaps with these points in the back of their minds, courts have in fact taken post-trial judicial notice of points relating to jurisdiction and venue, and there seems to be a growing trend toward making judges rather than juries responsible for deciding these points. Sound modern authority has concluded more generally that judicial notice in such settings lies beyond the reach of Rule 201.

Mueller & Kirkpatrick, *supra*, § 2:10.

case to case but apply universally." *United States v. Wolny*, 133 F.3d 758, 764 (10th Cir. 1998) (citations and quotation marks omitted).  The Eighth Circuit has expounded on their differences:

> When a court finds facts concerning the immediate parties who did what, where, when, how, and with what motive or intent the court is performing an adjudicative function, and the facts are conveniently called adjudicative facts.
>
> Stated in other terms, the adjudicative facts are those to which the law is applied in the process of adjudication.  They are the facts that normally go to the jury in a jury case.  They relate to the parties, their activities, their properties, their businesses.
>
> Legislative facts, on the other hand, do not relate specifically to the activities or characteristics of the litigants.  A court generally relies upon legislative facts when it purports to develop a particular law or policy and thus considers material wholly unrelated to the activities of the parties.
>
> Legislative facts are ordinarily general and do not concern the immediate parties.  In the great mass of cases decided by courts, the legislative element is either absent or unimportant or interstitial, because in most cases the applicable law and policy have been previously established.  But whenever a tribunal engages in the creation of law or of policy, it may need to resort to legislative facts, whether or not those facts have been developed on the record.

*United States v. Gould*, 536 F.2d 216, 219-20 (8th Cir. 1976) (citations and quotation marks omitted); *see also* Mueller & Kirkpatrick, *supra*, § 2:2 ("[A]djudicative facts are the 'who, what, where, and when' of a lawsuit . . . .").

## III.    Applying the Distinction

In *Gould*, the defendants were charged with importing a Schedule II controlled substance (cocaine).  536 F.2d at 217.  The statute defined a Schedule II controlled substance as, among other things, those substances containing coca leaves.  *Id.* at 218. The evidence at trial included expert testimony that the substance imported contained

cocaine hydrochloride but there was no direct evidence of cocaine hydrochloride being a derivative of coca leaves. *Id.* The trial court, however, took judicial notice of cocaine hydrochloride's status as a Schedule II controlled substance and instructed the jury: "If you find the substance was cocaine hydrochloride, you are instructed that cocaine hydrochloride is a schedule II controlled substance under the laws of the United States." *Id.* (quotation marks omitted). The Eighth Circuit concluded the trial court had not erred in taking judicial notice: "The fact that cocaine hydrochloride is derived from coca leaves is, if not common knowledge, at least a matter which is capable of certain, easily accessible and indisputably accurate verification." *Id.* at 219. It also decided no error occurred in the trial court's judicial notice instruction, which required the jury to accept the noticed fact as conclusive, contrary to Rule 201. *Id.* at 219-21. It determined Rule 201 not to apply because the judicially-noticed fact was a legislative fact, not an adjudicative one:

> It does not relate to who did what, where, when, how, and with what motive or intent, nor is it a fact which would traditionally go to the jury. The fact that cocaine hydrochloride is a derivative of coca leaves is a universal fact that is unrelated to the activities of the parties to this litigation.

*Id.* at 220-21 (citation and quotation marks omitted). Importantly, the court concluded the jury's role in determining adjudicative facts was not preempted because it was required to determine <u>what</u> substance was seized. *Id.* at 220-21; *see also United States v. Coffman*, 638 F.2d 192, 194 (10th Cir. 1980) (following the reasoning in *Gould* and finding no error in the trial court's instruction to the jury that LSD was a Schedule I controlled substance).

6

More to the point here is *United States v. Davis,* 726 F.3d 357 (2d Cir. 2013).

Davis assaulted another inmate while imprisoned at the Metropolitan Detention Center

(MDC), a federal prison located in New York.  He was charged with federal assault under

18 U.S.C. § 113(a)(6).  *Id.*  One of the elements of the crime—the so-called

"jurisdictional" element—required the assault to occur "within the special maritime and

territorial jurisdiction of the United States."  *Id.*  At trial, the testimony of MDC

employees identified MDC as a federal prison located on federal land.  *Id.* at 360-61.

Davis claimed the evidence was insufficient to establish an assault occurring within the

special maritime and territorial jurisdiction of the United States.  *Id.* at 362.  The Second

Circuit agreed.  *Id.* at 364-65.  Nevertheless, it took judicial notice of MDC's status as an

institution within the special maritime and territorial jurisdiction of the United States.  *Id.*

at 367.  In doing so it parted company with the trial judge, who had expressly refused "to

take judicial notice of anything."  *Id.* at 366 (quotation marks omitted).  Taking judicial

notice of a fact for the first time on appeal in a criminal case is noteworthy.  The Second

Circuit's reason for doing so was well grounded; Rule 201(f)'s proscription against

taking conclusive judicial notice in a criminal case does not apply to legislative facts.  *Id.*

at 367.  Similar to the Eighth Circuit's approach in *Gould*, it reasoned: "[W]hether a

particular plot of land falls within the special maritime and territorial jurisdiction of the

United States is a 'legislative fact' that may be judicially noticed without being subject to

the strictures of Rule 201."  *Id.*  It cited to other cases in which appellate courts noticed

federal jurisdiction over particular lands even where the prosecution had failed to present

direct evidence on the issue; "appellate courts take judicial notice of legislative facts

7

under appropriate circumstances, especially where they relate to straightforward questions, such as geography and jurisdiction." *Id.* (quotation marks omitted). Finally, and significantly, it expressed agreement with other circuits which have concluded that a defendant's Sixth Amendment right to a jury trial is not violated by taking judicial notice of legislative facts as they relate to the "jurisdictional" status of a particular piece of land. *Id.* at 369. It explained:

> [T]o determine whether a crime took place within the special maritime and territorial jurisdiction of the United States requires two separate inquiries: one to determine the 'locus of the crime' and one to determine the existence *vel non* of federal jurisdiction. While the former is plainly a factual question for the jury to decide, the latter—turning on a fixed legal status that does not change from case to case and involving consideration of source materials (such as deeds, statutes, and treaties) that judges are better suited to evaluate than juries—has always been treated in this Circuit as a legal question that a court may decide on its own.

*Id.* (citation omitted); *see also United States v. Behmanshah*, 49 F. App'x 372, 376 n.2 (3d Cir. 2002) (concluding evidence was sufficient to satisfy interstate commerce element of money laundering offense based on, *inter alia*, the use of an FDIC-insured institution; appellate court the first to notice the FDIC-insured status of subject bank) (unpublished).[7]

---

[7] While there is contrary authority, it uniformly fails to properly distinguish between legislative and adjudicative facts as courts have come to understand the distinction. In *Jones*, *supra*, the defendant was convicted of illegally intercepting telephone conversations. 580 F.2d at 221. One of the elements of the charge is that the telephone company which furnished and installed the tapped telephone be a "common carrier." *Id.* at 221-22. The only evidence on this element at trial was that the tapped telephone was furnished and installed by South Central Bell Telephone Company. *Id.* The government, seeking to save the conviction, requested the Sixth Circuit to take judicial notice of the fact that South Central Bell is a "common carrier." *Id.* at 222. While it acknowledged that Rule 201 allowed judicial notice to be taken at any time, even on appeal, the court decided judicial notice was inappropriate. *Id.* at 223-24. It relied on Rule 201's requirement for a criminal jury to be instructed that it may, but is not required

(Continued . . .)

8

These cases are highly persuasive, particularly *Davis*. I see no daylight between a federal prison's status as being "within the special maritime and territorial jurisdiction of the United States" and a bank's status as being federally insured. Particularly when all national banks are required to have FDIC insurance[8] and Wyoming law also requires the same for all banks in the state.[9] Rule 201 does not apply.

## IV. Noticing the Obvious Does Not Infringe Upon Iverson's Rights

---

to, accept as conclusive a judicially-noticed fact. *Id.* at 223. According to the Sixth Circuit, this rule "plainly contemplates that the jury in a criminal case shall pass upon facts which are judicially noticed. This it could not do if this notice were taken for the first time after it had been discharged and the case was on appeal." *Id.* at 224.

*Jones* failed to distinguish between adjudicative facts, covered by Rule 201, and legislative facts, not within the scope of Rule 201. The common carrier element involved in *Jones* is a legislative fact for the same reasons the status of the drugs in *Gould*, the status of the property in *Davis*, and (as I discuss) BHFSB's FDIC-insured status are all legislative facts.

Similarly, in *United States v. Bliss*, we refused to take judicial notice of the fact First National Bank of Green River was a member of the Federal Reserve System as required by the crime of conviction (falsifying bank records) because no request had been made by the government. 642 F.2d 390, 391-392 & n.2 (10th Cir. 1981). In any event, relying on *Jones*, we questioned the propriety of doing so. *Id.* at 392 n.2. But, even assuming it was proper, "we decline[d] to exercise our discretion and judicially notice these facts." *Id.* Given that holding, our reliance on *Jones* in our *Bliss* opinion was dicta.

Finally, *Garner, supra,* is not to the contrary. Whether defendants' actions would "foreseeably disturb or alarm the public," 368 U.S. at 165, is an adjudicative fact, not a legislative one. Taking judicial notice of such adjudicative fact for the first time on appeal would have been improper under Rule 201.

[8] *See* http://www.helpwithmybank.gov/get-answers/other-topics/fdic-insurance/faq-other-topics-fdic-insurance-04.html (last visited Feb. 25, 2016).

[9] Wyo. Stat. Ann. § 13-2-103 ("All banks shall obtain insurance of their deposits by the United States and shall subscribe for insurance of deposit accounts by the federal deposit insurance corporation (FDIC).").

Noticing the FDIC-insured status of the financial institutions involved here does not interfere with Iverson's right to a jury trial.[10] Like deciding (1) whether a crime took place within the special maritime and territorial jurisdiction of the United States (*Davis*) or (2) whether a defendant imported a Schedule II controlled substance (*Gould*), determining whether Iverson defrauded a FDIC-insured bank requires two separate inquiries: one to determine that Iverson did in fact defraud a certain bank and one to establish the existence of federal court jurisdiction. The former is clearly a question for the jury and the jury was so instructed in this case. (R. Vol. 1 at 113 (requiring jury to find beyond a reasonable doubt that "the defendant, Marvin Iverson, knowingly executed a scheme or artifice to defraud Big Horn Federal Savings Bank and JPMorgan Chase Bank")). The latter inquiry, on the other hand, is simply a legal question as to whether the bank is one with respect to which Congress can properly exercise its legislative powers.

Most of Iverson's arguments are little more than background noise intended to distract us from the core issue, his nearly palpable guilt. After all, a properly instructed jury convicted him. It did so after being instructed that no conviction could lie if it entertained a reasonable doubt as to whether "[BHFSB] and [JPM] are financial institutions within the meaning of the law; in this case that means the government must prove that [BHFSB] and [JPM] were insured by the [FDIC]." (R. Vol. 1 at 113.) At bottom, the question is whether a jury could so find on the evidence presented after

_____

[10] *See*, *supra*, discussion at 6-8.

crediting all permitted inferences and the individual jurors' common sense and life experiences.[11] With respect to the jury's determination several matters inform the debate: (1) it is commonly accepted that most banks in the United States are FDIC insured, (2) all national banks must be so insured, *see supra* n.8, (3) in Wyoming all banks must be FDIC insured, *see supra* n.9, (4) as Judge Hartz points out, evidence in the record reveals JPM's written claim to be FDIC insured (Majority Op. at 19-20), (5) the name, Big Horn <u>Federal</u> Savings <u>Bank</u>, is itself revealing, (6) Agent Smith's testimony regarding his investigation may be thin but it is worthy of some consideration,[12] and perhaps most important, (7) the FDIC-insured status of the banks was virtually uncontested. One might ask how compelling must evidence be on an uncontested point. Not very in a case such

---

[11] *See United States v. Truong*, 425 F.3d 1282, 1288 (10th Cir. 2005) ("We review claims of insufficient evidence de novo, but view the evidence, as well as the reasonable inferences that could be drawn from it, in the light most favorable to the government. An inference is reasonable if the conclusion flows from logical and probabilistic reasoning.") (citation and quotation marks omitted); *Webb v. United States*, 347 F.2d 363, 364 (10th Cir. 1965) ("[T]he jury's function [in a criminal case] is broad enough to allow it to make common sense inferences from proven facts . . . ."); *see also United States v. Durham*, 211 F.3d 437, 441 (7th Cir. 2000) ("[I]t is well established that juries are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict. While common sense is no substitute for evidence, common sense should be used to evaluate what reasonably may be inferred from circumstantial evidence.") (quotation marks omitted).

[12] The government apparently forgot to present proof of the banks' FDIC-insured status, creating a last-minute scramble to recover. Iverson recognized its oversight as a possible "gotcha" moment, not one requiring substantive evidence or argument, but only a technical objection. The government's feeble attempts to recover from its self-inflicted "gotcha" are puzzling. With the technological tools available in a modern federal courtroom one would expect the government to have presented the jury with a real time look at the FDIC website. All it takes is a computer connected to the internet and a monitor enabling jurors to view the available information. Doing so would have saved the government and us considerable angst.

11

as this where FDIC insurance is essentially collateral to the core issue—Iverson's criminal acts—and where the evidence of those acts (the "who, what, when, where, how and why (intent)") is overwhelming.

Taking judicial notice of legislative facts is efficient; it is also appropriate when, as here, no substantial rights of the defendant are put at risk by doing so.

No. 14-8071, *United States v. Iverson*

**PHILLIPS,** Circuit Judge, dissenting:


I respectfully dissent. Because I believe that the district court erred in admitting hearsay testimony from FBI Agent Kent Smith to establish that Big Horn Federal Savings Bank (Big Horn Bank) and JPMorgan Chase Bank were FDIC insured, I would reverse and remand for a new trial.

The government's case ended on a strange and abrupt note. After appearing to have finished examining its final witness, Agent Smith, the government realized that it had overlooked an element of Iverson's bank-fraud offense charged under 18 U.S.C. § 1344—proof that the two banks were FDIC insured. As Agent Smith prepared to step down from the witness stand, the government obtained the court's permission to continue his direct examination. What followed was a short but critical evidentiary skirmish—with the government trying to establish the FDIC-insurance element through Agent Smith, and Iverson and his standby counsel objecting each step of the way.

*1. Hearsay*

After recognizing the urgent need to establish the FDIC-insurance element, the government resumed its questioning of Agent Smith by asking whether he had done "any research" to determine the FDIC-insurance status of Big Horn Bank and JPMorgan Chase. R. vol. III at 85. The agent answered yes, adding that Big Horn Bank was so insured. To this volunteered testimony, Iverson's standby counsel successfully objected on foundation grounds. The government then circled back, asking what research Agent

Smith had done. This time, Agent Smith answered that for JPMorgan Chase he had "pulled up the FDIC website and found their information and their certificate number," and that for Big Horn Bank he had "been to that actual bank [and] requested a copy of their FDIC certificate which included their number."[1] *Id.*

The government then asked—interspersed with hearsay objections—whether looking at the FDIC website was "a normal course of business to check to see if a bank is FDIC insured . . . in your normal course of business as an FBI agent . . . " *Id.* at 85–86. Although Iverson objected on hearsay grounds, the government pressed forward without waiting for a ruling. After verifying that FBI agents "rely on those records to be accurate to determine if a bank is FDIC insured," the government asked its key question: "Do you know if the banks of Big Horn Federal Savings and . . . JPMorgan Chase are federally insured?" *Id.* at 86. This sparked another hearsay objection, which the district court overruled.[2] Agent Smith then said, "Yes, in my research both Big Horn Federal Savings Bank and JPMorgan Chase bank are federally insured." *Id.* Iverson chose not to cross-examine Agent Smith.

On appeal, Iverson contends that the district court abused its discretion by admitting Agent Smith's FDIC-insurance testimony because that testimony depended on hearsay statements contained within the referenced FDIC certificate and FDIC webpage.

---

[1] Notably, although certainly implying it, Agent Smith never in fact testified that he saw the certificate, raising the possibility that his testimony was based on a hearsay statement from someone at Big Horn Bank about the hearsay statement contained in the certificate.

[2] Nowhere did the government ever respond to Iverson's hearsay objection.

Primarily, Iverson's argument rests on an undisputed fact—the government never admitted into evidence either of the two FDIC records that the FBI agent relied on to prove the required FDIC-insurance element. Iverson contends that the district court permitted Agent Smith to introduce the hearsay statements by allowing him to testify about his memory of the two records' contents. Thus, Iverson argues that the district court correspondingly deprived him of any ability to examine the written contents of the two records or to challenge their admissibility on hearsay grounds.

On appeal, the government confesses the hearsay error. In doing so, it explains its reasoning well:

> [I]f a witness's knowledge about a fact of consequence is based only on the witness's personal knowledge of an out-of-court statement offered to prove the truth of the fact asserted in that statement, then [the witness's] testimony must comply with the hearsay rule; *i.e.*, it must be allowed by a statute, an exception to the rules of evidence, or by a Supreme Court rule.

Appellee's Br. at 9 (citing *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1132 (10th Cir. 2014) (citing Fed. R. Evid. 602 advisory committee's notes (1972))).

Along this same line, the government notes that "[i]n light of the foregoing rules, there can be little doubt that Special Agent Smith's testimony about the insured status of the two banks was hearsay." *Id.* at 10. First, the government says that Agent Smith relied on the FDIC certificate for Big Horn Bank—"clearly an 'out-of-court statement' that 'asserted' the fact that Big Horn was insured."[3] *Id*. Second, the government says that Agent Smith's testimony about the FDIC webpage showing insurance coverage for

---

[3] Indeed, as mentioned, Agent Smith premised his testimony that both banks were FDIC insured by saying that "*in my research* both Big Horn Federal Savings Bank and JPMorgan Chase are federally insured." R. vol. III at 86 (emphasis added).

3

JPMorgan Chase is no more than his saying, "I read it on the Internet." *Id.* For these reasons, the government concedes that Agent Smith's FDIC-insurance testimony lacked "the proper foundation from, for example, a records custodian from FDIC itself." *Id*. at 11 (citing *United States v. Cooper*, 375 F.3d 1041, 1045–49 (10th Cir. 2004)); *see Cooper*, 375 F.3d at 1045–49 (identifying various ways to prove FDIC insurance, including through an FDIC records custodian). Having identified the hearsay testimony, the government candidly acknowledges that it knows of no rule, statute, or exception to the hearsay rule permitting the district court to admit Agent Smith's hearsay testimony on the FDIC-insurance element.

In my view, the government correctly concedes Iverson's hearsay argument. Agent Smith based his FDIC-insurance testimony on out-of-court statements contained in records that the government never admitted at trial. The out-of-court statements Agent Smith relied on are hearsay—they are out-of-court statements "offer[ed] in evidence to prove the truth of the matter asserted in the statement[s]." Fed. R. Evid. 801(c). I see no reason for the government to elicit this testimony from Agent Smith other than *to prove the FDIC-insurance element*. And without Agent Smith's hearsay testimony, I see no other government proof that would even begin to prove this required element of the charged offense.

So in my view, the majority errs by refusing the government's concession of error. In doing so, it blesses an impermissible, unprecedented shortcut through the Federal Rules of Evidence. Rather than requiring the government to admit the hearsay documents into evidence through Fed. R. Evid. 803(8), 902, and 1005, the majority brushes past—

4

even ignores—the government's obligations under these rules. In doing so, the majority deprives Iverson of the protections afforded to him by those rules, all while declaring the rules met without ever seeing the records that Agent Smith says established the FDIC-insurance element. In effect, the majority guesses that the government could have produced and admitted the records—a guess that somehow renders compliance with the Federal Rules of Evidence unnecessary.

As support for this remarkable course, the majority falls back on strings of cases standing for propositions undisputed here—first, that if the government proceeds correctly it can introduce FDIC certificates under hearsay exceptions found in Fed. R. Evid. 803(6) and 803(8), Maj. Op. at 7; second, that parties in civil suits may introduce certain public records such as county tax assessments, U.S. patent certificates, and drivers' licenses under Fed. R. Evid. 803(8), Maj. Op. at 9–10; third, that parties in civil suits can introduce as public records webpages from public agencies, *id*. at 10–11; and, fourth, that courts may take judicial notice of webpages of public agencies, *id*. at 11.[4]

---

[4] But these cases do not support the majority's shortcut approach. Under the rules of evidence, a hearsay statement in a public record cannot be admitted into evidence apart from the public record—the hearsay statement can't travel alone. The majority's cited cases follow this rule. They allow the hearsay statements if the proponent admits into evidence the record containing the hearsay. *See, e.g.*, *United States v. Arthur*, 822 F.2d 60, 1987 WL 37871, at *3 (6th Cir. June 30, 1987) (unpublished table decision) (holding that *the certificate* was properly admitted under Fed. R. Evid. 803(8)); *United States v. Albert*, 773 F.2d 386, 389 (1st Cir. 1985) (holding that the district court properly admitted *the certificate* under the business-records exception, Fed. R. Evid. 803(6)). The rules disallow what the majority approves—witnesses being rewarded for leaving the public records elsewhere for no reason and opting for an empty-handed, "Trust me, here's what they say." The rules are not so trusting. *See* 5 C. Mueller and L. Kirkpatrick, Federal Evidence § 10:32, (4th ed. 2013) (providing that "[i]n its preferential aspect, Rule 1005 bars 'other evidence' of the content of a public document, or a document filed or

5

My chief criticism of the majority is that it ignores the key point that the parties emphasized—the government failed to admit into evidence either of the two records.[5] The majority steps too far by assuming the existence of the unproduced records and their automatic admissibility. Even if a proponent seeking admission of a record satisfies Fed. R. Evid. 1005—the best-evidence rule for public records—the rules would not relieve the proponent from also satisfying Rule 802. Thus, in my view, even if the government could have met Rule 1005 here, it would still have needed to admit into evidence the FDIC public records under Fed. R. Evid. 803(8) before Agent Smith could build FDIC-insurance testimony from hearsay statements within those FDIC records. *See United States v. Ruffin*, 575 F.2d 346, 355–56 (2d Cir. 1978) (concluding that although a copy of an IRS public record would have been "otherwise admissible" under Fed. R. Evid. 1005, the record would still have been inadmissible as hearsay); *cf. United States v. Johnson*, 594 F.2d 1253, 1255–56 (9th Cir. 1979) (requiring that separate, voluminous writings offered in a single summary under Fed. R. Evid. 1006 be independently admissible). For good reason, the rules require a proponent of documentary-hearsay evidence to persuade the district court of the hearsay's admissibility after considering any objections from the opponent.

---

recorded in public office, if a copy may be had." (citing *Amoco Prod. Co. v. United States*, 619 F.2d 1383, 1390 n.6 (10th Cir. 1980))).

[5] In *Stearns v. Paccar, Inc.*, 986 F.2d 1429, 1993 WL 17084, at *5 (10th Cir. Jan. 22, 1993) (unpublished table decision), we disallowed as inadmissible hearsay a plaintiff's testimony about what salaries he had seen on W-2 forms of other employees. We required that "to admit evidence regarding the W-2 forms of other . . . employees, Plaintiffs were required to submit the W-2 forms to the district court through [the company's] records custodian." *Id.*

The government doesn't need us to ease its evidentiary burdens. Nothing in the rules blocks the government's clear path to admitting FDIC certificates to prove that financial institutions are FDIC insured. *See Cooper*, 375 F.3d at 1048 (outlining ways the government can admit an FDIC certificate to satisfy the FDIC-insurance element). The government might well succeed by simply bringing an FDIC certificate to court together with a knowledgeable witness who could testify about the bank's FDIC-insurance status. *See United States v. Brunson*, 907 F.2d 117, 119 (10th Cir. 1990) (concluding that a bank manager's testimony—along with the FDIC certificate—sufficiently proved the FDIC-insurance element). Rule 803(8) is a blinking neon sign promising hospitality to litigators seeking admission of public records. But the rules of evidence afford a party opposing the admission of public records—such as the FDIC certificate and FDIC webpage here—the opportunity to challenge relevancy, trustworthiness, and authenticity of the proffered record. Fed. R. Evid. 803(8), 902. Our task here is a modest one—to enforce the rules.

In my view, the majority's judicial-shortcut approach awards a forfeit win to the government contrary to the Federal Rules of Evidence. In effect, the majority has created its own exception to the Rule 803(8) hearsay exception. Under its approach a witness— like Agent Smith—need no longer produce and admit into evidence at trial hearsay records, but instead can wing it by testifying from memory about the critical contents of the hearsay records. That alone is a startling development, but doubly so when the witness's testimony is offered to prove a required element of a criminal offense.[6] *See*

---

[6] Nor do I think taking judicial notice of the FDIC's webpage would solve the problem. *See* Maj. Op. at 11; Concurrence at 1–2, 9–12. For starters, I believe the FDIC-

7

*United States v. Gaudin*, 515 U.S. 506, 522–23 (1995) (concluding that "[t]he Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged. The trial judge's refusal to allow the jury to pass on the 'materiality' of Gaudin's false statements [under 18 U.S.C. § 1001] infringed that right.").

By rolling out this red carpet, the majority essentially invites the government to forgo any hassles arising from pesky criminal defendants examining and challenging the content, trustworthiness, and authenticity of records containing hearsay—even when those records establish elements of charged crimes.[7] Although the majority cites many cases, I see none among them approving its evidentiary detour.

---

insurance element concerns an adjudicative fact, not a legislative one. *See* Fed. R. Evid. 201. Either the banks here had the FDIC insurance or they didn't—this inquiry is one about "simply the facts of the case." *Id.* advisory committee's notes. The FDIC-insurance question is a "fact[] that normally go[es] to the jury in a jury case." *Id.* I don't see how the presence of FDIC insurance involves legislative facts—"those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body." *Id.* I don't see FDIC insurance as similar to the primary example of legislative facts given in the advisory notes—the fact determinations underlying the policy of the spousal privilege. *Id.*

[7] Even though the government itself doesn't think it fairly convicted Iverson, the majority overrides the government's concession and declares otherwise. If the government's proof here truly satisfies its burden to prove the charged offense, I'm unsure why the majority provides alternative means of proof or chastises the government for its method of proof. Maj. Op. at 17, 17 n.2. By lowering the bar, the majority invites the government to do no more next time or any other time.

8

## 2. *Best-Evidence Rule*

On appeal, but not at trial, Iverson argues that Agent's Smith's testimony about the FDIC-insurance element also violated the best-evidence rule, Fed. R. Evid. 1002. Appellant's Opening Br. at 14. Thus, Iverson must show (1) "an error," (2) that is plain, and that (3) "affect[s] the [defendant's] substantial rights." *Puckett v. United States*, 556 U.S. 129, 135 (2009). If Iverson establishes all three prongs, an appellate court may exercise its discretion to correct the error only if (4) the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 736 (1993).

For the first prong, I agree with Iverson that Agent Smith's testimony violated the best-evidence rule (since the government didn't admit into evidence originals or copies of the two public records). Fed. R. Evid. 1002, 1005. Unquestionably, Agent Smith based his FDIC-insurance testimony on the contents of the two public records. And, obviously, the government did not try to excuse its failure to produce copies of these two public records based on their being unobtainable despite reasonable diligence. *See* Fed. R. Evid. 1005. Thus, the government could prove the content of the records only by producing them, establishing their admissibility, and ensuring that the copies of the public records were "certified as correct in accordance with Rule 902(4) or is testified to be correct by a witness who has compared [them] with the original[s]."[8] *Id.* For plain error's second

---

[8] Although Rule 1005 is located within Article X of the Federal Rules of Evidence, "Contents of Writings, Recordings, and Photographs," and concerns "best evidence," it regulates testimonial hearsay, too. We need look no further than the effect of the rule in our case—because the government didn't admit a copy of the FDIC public

9

prong, I would conclude that the requirements of Rule 1005 are well-established, so admitting testimony about the contents of the records without producing and admitting the documents themselves was error that is plain.[9]

Even so, Iverson would fail the latter two prongs of plain-error review. For the third prong, he cannot show that the best-evidence error was "prejudicial, meaning that there is 'a reasonable probability that, but for the error claimed, the result of the proceeding would have been different.'" *United States v. Algarate-Valencia*, 550 F.3d 1238, 1242 (10th Cir. 2008) (quoting *United States v. Gonzalez-Huerta*, 403 F.3d 727, 733 (10th Cir. 2005)). Had the district court sustained Iverson's hearsay objection to Agent Smith's FDIC-insurance testimony, the government may well have called additional witnesses to establish that Big Horn Bank and JPMorgan Chase were FDIC insured. In addition, for the fourth prong, Iverson cannot show that admitting Agent

---

records, Rule 1005 *bars* hearsay testimony like Agent Smith's (as "other evidence"). Thus, I'd conclude that Iverson's general hearsay objection was sufficient to reach Rule 1005's testimonial-hearsay bar.

[9] The majority concludes that any error would not be plain, saying that "[t]he best-evidence rule does not apply to testimony relating to the *existence* of a document, as opposed to its contents." Maj. Op. at 14 (emphasis in original). To illustrate its point, the majority cites *United States v. Beebe*, 467 F.2d 222, 225 (10th Cir. 1972), where "we held that the best-evidence rule did not prevent witnesses from testifying 'that their businesses were "licensed dealers" in firearms rather than producing documents evidencing their actual licensing.'" Maj. Op. at 15. On the same point, the majority also cites *United States v. Sliker*, 751 F.2d 477, 483 (2d Cir. 1984), where the Second Circuit upheld, over a best-evidence challenge, testimony that a bank was FDIC insured. Maj. Op. at 15. What the majority misses is the context of the testimony in those cases— neither involved witnesses testifying about the contents of the federal-firearms license or FDIC-insurance certificates. Had those two cases involved that sort of testimony—as Agent Smith's testimony surely did—the best-evidence rule would have barred the testimony as it would here.

Smith's testimony "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736. Neither in the district court nor on appeal has Iverson even disputed that the two financial institutions were in fact FDIC insured.

### 3. Sufficiency of the Evidence

I agree with the majority that sufficient evidence would support Iverson's conviction if Agent Smith's FDIC testimony had been admissible. But because I believe the hearsay rule should have disallowed this testimony, I cannot vote to affirm Iverson's conviction.

In this circumstance, the government directs us to *Lockhart v. Nelson*, 488 U.S. 33 (1988). There, the Supreme Court reviewed a case in which a jury convicted a defendant (Lockhart) of being a habitual criminal after finding that he had four previous felony convictions. *Id.* at 36. In a federal habeas proceeding, Lockhart showed that he had previously obtained a pardon for one of the convictions. *Id.* at 37. Throughout his prosecution, the government mistakenly contended that Lockhart had not been pardoned, but that his sentence had merely been commuted. *Id.* at 36. In contending that the Double Jeopardy Clause barred a resentencing at which the government could offer proof of an unrelated, additional felony conviction, Lockhart relied on *Burks v. United States*, 437 U.S. 1, 11 (1978), which disallows reprosecution when a conviction is reversed for insufficiency of evidence. While recognizing the rule of *Burks*, the *Lockhart* Court created an exception to that rule, holding "that in cases such as this, where the evidence offered by the State and admitted by the trial court—whether erroneously or not—would

11

have been sufficient to sustain a guilty verdict, the Double Jeopardy Clause does not preclude retrial. *Id*. at 34.

I agree with the government that a retrial is the proper remedy here since the government's total evidence—including the erroneously admitted hearsay testimony of Agent Smith—would have sufficed to sustain Iverson's guilty verdict.[10] Appellee's Br. at 13. In fact, in the district court, Iverson never even argued that the evidence would be insufficient if the hearsay testimony were admitted. Nor did Iverson renew his foundation objection in response to Agent Smith's testifying that the two banks were FDIC insured. I agree that if Agent Smith's FDIC-insurance testimony had been admissible, the evidence would have sufficed to sustain Iverson's conviction.[11] Accordingly, I would reverse and remand for retrial in accordance with *Lockhart*.

---

[10] In his reply brief, Iverson doesn't cite *Lockhart*. He does cite a case that in turn cites *Lockhart*—*United States v. Medina-Copete*, 757 F.3d 1092 (10th Cir. 2014)—but that case dealt with an entirely different situation; that is, one in which sufficient evidence supported the jury's guilty verdict, but we still worried that inadmissible evidence may have contributed to the verdict. *Id*. at 1107–08. In addition, Iverson cites *United States v. Wheeler*, 776 F.3d 736 (10th Cir. 2015), a case in which we found sufficient evidence to convict because we couldn't "say that no rational juror could find Mr. Wheeler's statements to be true threats." *Id*. at 746. In short, Iverson hasn't really addressed the government's *Lockhart* argument.

[11] And, for the same reason as the majority gives, I would conclude that the government's failure to tie its FDIC-insurance proof to the exact dates of Iverson's charged conduct does not defeat the evidence's sufficiency. *See United States v. Tukes*, 442 F. App'x 373, 374 (10th Cir. 2011) (unpublished) (upholding a conviction when the bank's manager said that the bank "is" federally insured after agreeing with "our sister circuits [that] have held that analogous present-tense testimony can be understood to mean that a bank was insured at the time of the offense").

12

# Federal Deposit
# Insurance Corporation

### Bank Information

Big Horn Federal Savings Bank - Active (FDIC # 29637)  Insured Since  February 28, 1936

**Data as of: February 21, 2016**

### Big Horn Federal Savings Bank is an active bank

| | |
|---|---|
| FDIC Certificate#: | 29637 |
| Headquarters: | 33 North 6th Street<br>Greybull, WY 82426<br>Big Horn County |
| Locations: | 6 domestic in 1 states,<br>0 in territories, and 0 in foreign locations |
| Established: | January 1, 1935 |
| Insured: | February 28, 1936 |
| Bank Charter Class: | Savings Association |
| Regulated By: | Office of the Comptroller of the Currency |

**Corporate Website:**

http://www.bighornfederal.com

**Consumer Assistance:**

http://www.helpwithmybank.gov

Contact the FDIC about:

Big Horn Federal Savings Bank

**Showing 1 to 4 of 4 entries**

Show 10 ∨ entries

| Date | Event |
|---|---|
| 1/1/1935 | Institution established: Original name:Big Horn Federal Savings and Loan Association (29637) |
| 9/19/1990 | Changed name to **Big Horn Federal Savings Bank** (29637) |
| 9/19/1990 | Changed organization type to MUTUAL SAVINGS BANK |
| 7/21/2011 | Changed primary regulatory agency from OFFICE OF THRIFT SUPERVISION to COMPTROLLER OF THE CURRENCY |